

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-4-1994

# J&R Ice Cream Corp. v. California Smoothie Licens. Corp.

Precedential or Non-Precedential:

Docket 93-5516, 93-5547

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

Recommended Citation

"J&R Ice Cream Corp. v. California Smoothie Licens. Corp." (1994). *1994 Decisions.* Paper 102.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/102

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


Nos. 93-5516 and 93-5547


J & R ICE CREAM CORPORATION,
a Corporation of the State of Florida

v.

CALIFORNIA SMOOTHIE LICENSING CORPORATION,
a Corporation of the State of New Jersey;
CALIFORNIA SMOOTHIE INTERNATIONAL, INC.,
a Corporation of the State of New Jersey,

Defendants/Third-Party
Plaintiffs

v.

JEFFREY K. BAUGHER;
RICHARD ROSSETTI,

Third-Party Defendants


California Smoothie Licensing Corporation
and California Smoothie International, Inc.,

Appellants-Cross-Appellees

J & R Ice Cream Corporation,

Appellee-Cross-Appellant


On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civ. No. 89-4638)


Argued June 23, 1994

BEFORE:  GREENBERG and STAPLETON, Circuit Judges,
and FARNAN, District Judge*

(Filed:  August 4, 1994)


1

* Honorable Joseph J. Farnan, Jr., United States District Judge
for the District of Delaware, sitting by designation.

_____

                                    Samuel B. Santo, Jr. (argued)
                                    Gregory B. Reilly
                                    Lowenstein, Sandler, Kohl,
                        Fisher & Boylan
                                    65 Livingston Avenue
                                    Roseland, N.J. 07068

_____           Attorneys for Appellants-
_____           Cross-Appellees
_____           California Smoothie
_____           Licensing Corp. and
_____           California Smoothie
_____           International, Inc.

                                    Brian P. Sullivan (argued)
                                    Jay M. Zuckerman
                                    Smith, Stratton, Wise, Heher &
                        Brennan
                                    600 College Road East
                                    Suite 4200
                                    Princeton, N.J. 08540

_____           Attorneys for Appellee-
                                    Cross-Appellant J & R
                                    Ice Cream Corporation
                                    _____

OPINION OF THE COURT


GREENBERG, Circuit Judge.

## I. FACTUAL AND PROCEDURAL HISTORY

### A. Factual History

This appeal arises from an unsuccessful attempt of a franchisee to operate a restaurant in Florida. The appellants-cross-appellees are California Smoothie International, Inc. (CSI) and its wholly-owned subsidiary, California Smoothie

2

Licensing Corporation (CSLC). As a matter of convenience, we sometimes will refer to CSI and CSLC singularly as "California Smoothie". CSI owns and operates California Smoothie restaurants, and CSLC franchises California Smoothie restaurants. The appellee-cross-appellant is J & R Ice Cream Corporation, the franchisee, which Jeffrey Baugher and Richard Rossetti founded in 1984. We note that in the business, restaurants sometimes are called "stores" and thus we will use that term.

We recite the facts taken from the perspective of J & R Ice Cream as the verdict winner. Baugher and Rossetti are longtime friends who decided in the 1980's to open an ice cream shop together. Soon after incorporating J & R Ice Cream for that purpose, they decided that to secure a desirable location and financing, they would try to acquire a franchise. They initiated preliminary discussions with a number of franchisors, including Frusen Gladje and Steve's Ice Cream. However, during the summer of 1985, Robert Keilt, a childhood acquaintance of the Baugher and Rossetti families who was the president of CSI and CSLC, learned from Baugher's brother that Baugher and Rossetti were considering acquiring a franchise. Subsequently, Joseph Kennedy, vice president of franchising and development for CSLC, contacted Baugher and suggested that they consider acquiring a California Smoothie franchise in the Boca Town Center in Boca Raton, Florida. Baugher agreed to attend a meeting at California Smoothie's headquarters in Clifton, New Jersey, to discuss that possibility. Prior to the meeting, California Smoothie sent Baugher brochures regarding California Smoothie franchises which

3

contained representations concerning California Smoothie's expertise in site selection.

The first meeting regarding the acquisition of a California Smoothie franchise by Baugher and Rossetti was on August 8, 1985. On that date, Baugher met first with Kennedy, then with Keilt, and then with Kennedy again. According to Baugher, in their initial discussions Kennedy told him that the average California Smoothie franchise accrued $300,000 in sales per year, that a store at the Boca Town Center would produce at least that level of sales and probably more, and that all existing stores were earning between 18 and 20 percent profit. Baugher then met with Keilt who reiterated Kennedy's representations. Finally, when Baugher met with Kennedy again after speaking with Keilt, Kennedy gave Baugher documents containing sales and profit figures for California Smoothie company-owned stores earning substantial profits. Some of the documents contained a "disclaimer" stating that prospective franchisees should not rely on the figures. Nonetheless, Kennedy told Baugher to ignore the disclaimer because it was merely a legal requirement. Kennedy also told Baugher that the distribution of the documents containing sales and profit figures to prospective franchisees violated FTC regulations and California Smoothie policy. Moreover, he gave Baugher CSLC's Uniform Offering Circular, which included the following statement:

> [t]he Franchisor does not disclose to prospective Franchisees the actual, average or projected sales, profits or earnings of

> existing California Smoothie restaurants. In
> the event that a prospective Franchisee
> should obtain such information, it should not
> be relied upon, since any information
> pertaining to sales, profits, or earnings is
> intended for internal use only as a basis for
> the Franchisor's management decisions.

Uniform Offering Circular § 19, app. at 105.

The second meeting regarding the acquisition of a California Smoothie franchise by Baugher and Rossetti involved Rossetti and California Smoothie representatives, James Skouras and Gary Goddard. Goddard assured Rossetti that he and Baugher could match the profit and sales figures on certain documents Goddard showed him. There was a third meeting on August 26, 1985, when Baugher met with Keilt and Skouras who suggested that Baugher consider the Pompano Fashion Square Shopping Center site in Pompano Beach, Florida, for a franchise and indicated that a store at that site would have sales in excess of $300,000 per year.

In September 1985, Baugher and Rossetti submitted franchise applications to California Smoothie, expressing interest in acquiring a franchise at the Boca Raton site. On November 22, 1985, California Smoothie notified Baugher and Rossetti that their applications had been approved. However, shortly thereafter California Smoothie informed them that Keilt had decided not to locate a "full-line-menu" restaurant at the Boca Town Center due to the lease economics of the site.[0]

---

[0] California Smoothie Restaurants served items including pita sandwiches, yogurt and blended fruit drinks. Their menus varied, however, from full-line menus including the greatest variety of products, to menus limited almost exclusively to the California Smoothie blended fruit drinks.

Meanwhile, in November 1985, CSI leased space in the food court scheduled to open at the Pompano Fashion Square Shopping Center some time in 1986. In late December 1985, Keilt and Skouras contacted Baugher and Rossetti and told them that a store at the Pompano mall would produce at least $300,000 in sales per year. Moreover, Keilt told Baugher that California Smoothie had conducted a full investigation of the Pompano mall site, including studies of demographic information.

Baugher and Rossetti retained an accountant, Thomas Maniscalo, to evaluate the Pompano mall site and to help them get financing should they choose to acquire a California Smoothie franchise. Maniscalo had several conversations with Keilt and another representative of California Smoothie, who indicated to him the level of gross sales and expenses associated with a franchise. In these discussions, the California Smoothie representatives understated the expenses and failed to mention that certain California Smoothie restaurants were operating at a loss or had closed due to financial failure. Based on the misleading information he received, Maniscalo advised Baugher and Rossetti to acquire the Pompano mall California Smoothie franchise.

On January 28, 1986, Baugher and Rossetti entered into a site selection agreement with CSLC, and made a $5,000 downpayment on CSLC's $25,000 franchise fee. Subsequently, on February 21, 1986, Baugher and Rossetti paid the remaining $20,000 of the franchise fee and executed a franchise agreement and a sublease entitling and obligating them to operate a

6

California Smoothie Restaurant at the site leased by CSI in the food court at the Pompano mall. Prior to executing these agreements, Baugher and Rossetti expressed concern that the lease negotiated by CSI with the Pompano mall's landlord did not contain a cap on the common area maintenance fees. Indeed, California Smoothie's guidelines indicated that common area maintenance fees for a food court should not exceed two per cent of gross sales. Keilt responded to their concern by stating that he and the landlord had reached an oral agreement providing that common area maintenance fees would not exceed three percent of gross sales.

Baugher and Rossetti opened their California Smoothie restaurant at the Pompano mall on June 8, 1986, and on August 6, 1986, they assigned their rights in the franchise agreement to J & R Ice Cream. By the end of 1986, the franchise was operating at a loss. Baugher and Rossetti complained to CSLC about their gross sales and about the level of the food court maintenance fees which the mall collected from food court tenants.[0] These fees totaled more than the promised three percent of the restaurant's gross sales. After unsuccessfully seeking a reduction in the fees from the agent representing the mall's landlord, CSLC filed a lawsuit against the landlord and its agent in a Florida state court, alleging that the agent had made material misrepresentations to CSI during the lease negotiations.

---

[0] The mall's landlord assessed CSI for the food court maintenance fees, and then CSI assessed Baugher and Rossetti for them pursuant to the sublease.

7

At that time, CSI began making reduced rent payments to the landlord and, in turn, began collecting reduced rent payments from J & R Ice Cream.

However, in October 1988, when settlement negotiations between CSI and the landlord proved unsuccessful, CSLC demanded that J & R Ice Cream pay the full amount owed under the sublease, including all past-due amounts. But J & R Ice Cream refused to pay the full amount due and continued to make reduced rent payments. J & R Ice Cream incurred losses in 1987, 1988, and 1989. On November 6, 1989, J & R Ice Cream brought suit against CSI and CSLC. Subsequently, in December 1989, CSLC terminated J & R Ice Cream's franchise, and in February 1990, J & R Ice Cream gave CSLC notice of its intent to abandon the premises and cease operations, and it did so by March 1990.

B.    Procedural History

As we have indicated, J & R Ice Cream filed the complaint in this diversity of citizenship action on November 6, 1989. The complaint alleged violations of the Florida Franchise law, the Florida Business Opportunity Law, the Florida Deceptive and Unfair Trade Practices Act, the New York Consumer Protection from Deceptive Practices Act, and the New Jersey Consumer Fraud Act. See app. at 6-10, 12-15. The complaint also contained an equitable fraud count and a count alleging that California Smoothie was negligent in its selection of the Pompano mall site and its negotiation of the lease there. Id. at 11-12, 15-17. At a settlement conference in early August 1991, the district court

8

indicated that it would entertain choice-of-law motions, but not motions for summary judgment. Later that month, the parties filed choice-of-law motions and ultimately the court ruled that New Jersey law governed the action. Thus, the claims under Florida and New York law were dismissed. In September 1992, the parties consented to a jury trial before a magistrate judge. The trial began in the district court on May 3, 1993. Before the court submitted the case to the jury, J & R Ice Cream decided to forego its equitable fraud claim, and thus the court submitted only the New Jersey Consumer Fraud Act claim and the negligence claim to the jury.

On May 19, 1993, the jury found that CSI and CSLC violated the New Jersey Consumer Fraud Act by: (1) representing to J & R Ice Cream, without a reasonable basis in fact, that J & R would accrue gross sales of no less than $250,000 in its first year of operation at the Pompano location, and was likely to accrue more than $300,000 in gross sales; (2) representing, without a reasonable basis in fact, that they had acquired expertise in selecting profitable locations for franchises and had utilized that expertise in selecting the Pompano mall site; and (3) representing, without a reasonable basis in fact, that the food court common area maintenance fees at the Pompano mall would not exceed three percent of gross sales. Moreover, as noted above, the jury also found that CSI and CSLC had been negligent in the manner in which they selected the Pompano mall location and in the manner in which they negotiated the terms of the lease for that location.

Based on its findings, the jury awarded J & R Ice Cream $200,000 for California Smoothie's violations of the New Jersey Consumer Fraud Act, and $55,000 for California Smoothie's negligent conduct. The $200,000 verdict was a lump sum which did not distinguish among the liability theories under the Consumer Fraud Act. The court trebled the damages for the New Jersey Consumer Fraud Act violations pursuant to N.J. Stat. Ann. § 56:8-19 (West 1989), and, in a post-trial hearing, the court awarded J & R Ice Cream $287,455.83 in attorney's fees and costs. However, the court struck the jury's award of $55,000 on the negligence count and refused to award J & R Ice Cream prejudgment interest on the verdict. Thus, the total award to J & R Ice Cream as reflected in the court's order of judgment, was $887,455.83. CSI and CSLC appeal from the judgment entered on July 20, 1993, on the jury's verdict, and J & R Ice Cream cross-appeals from the court's denial of prejudgment interest and its decision to strike the jury's award of negligence damages.

## II.  DISCUSSION

### A. An Overall View

The district court's jurisdiction was based upon 28 U.S.C. § 1332. Plaintiff J & R Ice Cream is a citizen of Florida, with its principal place of business in that state, the defendants CSI and CSLC are citizens of New Jersey with their principal places of business in that state, and the amount in

10

controversy exceeds $50,000.[0]  Our jurisdiction is based on 28 U.S.C. § 636(c)(3) and 28 U.S.C. § 1291 inasmuch as this is an appeal from a final order of judgment in a trial presided over by a magistrate judge pursuant to 28 U.S.C. § 636(c)(1).

California Smoothie challenges the jury's verdict on six grounds:  (1) that the court erred in admitting testimony by unrelated former California Smoothie franchisees as to misrepresentations California Smoothie made to them; (2) that the court erred in applying the New Jersey Consumer Fraud Act to the sale and acquisition of a franchise; (3) that the proof that California Smoothie falsely represented that it had acquired expertise in selecting profitable locations for franchises and that it had utilized that expertise in selecting the Pompano mall site did not establish a violation of the Consumer Fraud Act; (4) that the evidence did not support the jury's finding that California Smoothie represented to Baugher and Rossetti that "they could expect gross sales of $250,000 and likely in excess of $300,000";[0] (5) that the court erred in admitting parol

---

[0]The complaint stated that CSLC had "a" principal place of business in New Jersey, leaving open the possibility that it had "its" principal place of business in Florida.  Thus, the complaint did not properly plead diversity jurisdiction.  See Hunt v. Acromed Corp., 961 F.2d 1079, 1080, 1082 n.7 (3d Cir. 1992).  However, letters and supporting material submitted to this court indicate that at the time the complaint was filed, CSLC's principal place of business was in New Jersey.  Therefore, we regard the jurisdictional problem as cured.  See 28 U.S.C. §1653.  Baugher and Rossetti, who were additional defendants on a counterclaim, are citizens of New York and Florida, respectively.
[0]The quotation which we take from California Smoothie's brief is a paraphrase of J & R Ice Cream's complaint and of an interrogatory to the jury.

11

evidence of one of the three misrepresentations allegedly made by California Smoothie; and (6) that the court erred in concluding that California Smoothie had a duty to select a franchise site and negotiate a lease for Baugher and Rossetti.

For reasons which we set forth below, we conclude that the district court abused its discretion by permitting J & R Ice Cream to introduce the testimony by former California Smoothie franchisees who were unrelated to J & R Ice Cream and its founders. Moreover, we find that the introduction of this evidence was prejudicial with regard to the Consumer Fraud Act count, a conclusion that standing alone would require a new trial on that count.

However, as we noted above, California Smoothie argues that the Consumer Fraud Act does not apply to the sale and acquisition of a franchise. We agree. Therefore, we will not remand for a new trial on the Consumer Fraud Act count. Rather, we will remand the matter for entry of a judgment for California Smoothie on that count. Nevertheless, we will remand this case to the district court for a hearing to determine whether J & R Ice Cream is entitled to a new trial on its equitable fraud claim, as J & R Ice Cream contended at oral argument before us that it only abandoned this cause of action after learning that the district court would not entertain motions for summary judgment and after it reasonably concluded that California Smoothie did not intend to challenge the Consumer Fraud Act's

12

applicability to this case.[0]  If the district court agrees with these factual contentions, it may deem it appropriate to reinstate the equitable fraud claim.  We will reinstate the jury's verdict against California Smoothie on the negligence count, as the testimony by former California Smoothie franchisees did not taint the judgment on this count, and the district court was correct in concluding that California Smoothie had a duty to select a franchise site and negotiate a lease for Baugher and Rossetti.

In its cross-appeal, J & R Ice Cream challenges the district court's denial of prejudgment interest on the Consumer Fraud Act damages and the court's decision to strike the jury's award of negligence damages because they were duplicative of the Consumer Fraud Act damages.  In light of our decision that the district court's admission of testimony by former franchisees requires reversal of the Consumer Fraud Act judgment and that the

---

[0]We recognize that in view of our conclusion that the Consumer Fraud Act does not apply to the sale of a franchise that we probably could avoid deciding the admissibility of the testimony of the former franchisees.  Nevertheless we reach that question because the evidence issue raises an important question of federal law which we think that we should decide.  In light of our decision, however, we need not reach California Smoothie's claims: that the proof that California Smoothie falsely represented that it had acquired expertise in selecting profitable locations for franchises and that it had utilized that expertise in selecting the Pompano mall site did not establish a violation of the Consumer Fraud Act; that the evidence did not support the jury's finding that California Smoothie represented to Baugher and Rossetti that "they could expect gross sales of $250,000 and likely in excess of $300,000"; and that the court erred under New Jersey law in admitting parol evidence of one of the three misrepresentations allegedly made by California Smoothie.  None of these claims raise important federal questions.

13

Consumer Fraud Act is inapplicable to the sale and acquisition of a franchise, we need not reach these claims and we will dismiss the cross-appeal as moot.[0]

Instead, we will vacate the district court's order striking the negligence damages and remand with instructions to reinstate the negligence damages, enter a judgment for them, and award prejudgment interest on these damages. We follow this course because the district court concluded that the damages awarded on the negligence claim against California Smoothie duplicated the damages awarded on the Consumer Fraud Act claim against California Smoothie. It reached this conclusion as it reasoned that "the damages which would proximately flow from a misrepresentation as to expertise in site selection and failure to utilize that expertise properly [are] the same damages which would flow from a negligence claim" based on California Smoothie's alleged negligence in selecting the site. See supp. app. at 519. For this reason, the district court refused to enter judgment on the $55,000 awarded by the jury on the

---

[0]CSI and CSLC have filed proceedings under Chapter 11 of the Bankruptcy Code but on November 29, 1993, they obtained an order from the bankruptcy court permitting them to continue this appeal. They contend that the order does not allow J & R Ice Cream to prosecute its cross-appeal. We need not consider this point because we are dismissing the cross-appeal. While we recognize that we are requiring entry of a judgment in favor of J & R Ice Cream on the negligence claim, we do not reach that result by reversing on the cross-appeal. Rather, we are remanding for entry of the judgment because we are reversing on California Smoothie's appeal and a consequence of that reversal is a reinstatement of the negligence verdict and the entry of a judgment thereon. We do not regard that outcome as implicating the automatic stay.

14

negligence count.  <u>Id</u>. at 520; app. at 42–43 (order of judgment).

Thus, the negligence damages should be reinstated because, based

on our decision, they no longer are duplicative.[0]

Prejudgment interest should be allowed on the judgment

on the negligence claim pursuant to N.J. Ct. R. 4:42–11(b) which

provides that prejudgment interest shall be awarded in all but

"exceptional" circumstances.  In reaching this conclusion, we

have considered the district court's reasoning in disallowing

interest on the Consumer Fraud Act judgment:

> [u]nder the circumstances where a treble
> damage award is made to a prevailing
> plaintiff, . . . to additionally award
> prejudgment interest would in effect provide
> such a windfall and double recovery and this
> does indeed constitute exceptional
> circumstances.
>
> As noted by counsel for plaintiff, the
> purpose behind the rule is twofold; to
> encourage settlement and to make the
> plaintiff whole.  In the situation where
> treble damages are awardable, the treble
> damages [are] more than adequate to make a
> plaintiff whole; and indeed the prospect of
> treble recovery is also more than adequate to
> make a defendant focus on settlement and
> encourage settlement.

<u>See</u> supp. app. at 522.  But based on our decision that J & R Ice

Cream is no longer entitled to treble damages, the district

court's reasoning is no longer applicable.  Thus, J & R Ice Cream

is entitled to prejudgment interest on the negligence damages

pursuant to the ordinary application of N.J. Ct. R. 4:42–11(b).

---

[0]Of course, if the district court grants J & R Ice Cream a new
trial on its equitable fraud claim and enters judgment against
California Smoothie on this claim, a portion of the relief on the
fraud claim may be duplicative of the negligence damages.

15

B.    The Testimony from Former Franchisees

California Smoothie objected to the admission of the testimony of former California Smoothie franchisees on multiple occasions.  See e.g., supp. app. at 13 (motion in limine), id. at 283 (prior to testimony of former franchisees), id. at 505 (charge conference), id. at 517-18 (post-trial motion).  Nevertheless, J & R Ice Cream argues that we should not address California Smoothie's claim that the district court erred in admitting this testimony.  In this regard, J & R Ice Cream contends that even if the testimony was inadmissible for purposes of its Consumer Fraud Act claim, California Smoothie is barred from challenging the admission of this testimony on appeal, because the evidence was admissible for purposes of its equitable fraud claim and California Smoothie failed to request a limiting or curative instruction after J & R Ice Cream voluntarily dismissed its equitable fraud claim.  See br. at 23.  However, the record indicates that California Smoothie continued to object to the admission of the testimony after J & R Ice Cream dismissed its equitable fraud claim, see supp. app. at 505 (charge conference), that the district court continued to hold that the testimony was admissible, id. at 505 (charge conference), 517-18 (post-trial motion), and that J & R Ice Cream capitalized on the admission of the testimony by arguing in its closing that the former franchisees's testimony regarding misrepresentations made to them by California Smoothie was evidence that California Smoothie made misrepresentations to Baugher and Rossetti, id. at

16

509.[0]  Thus, California Smoothie is not barred from challenging the admission of this testimony on appeal.

The district court allowed J & R Ice Cream to introduce testimony by two former California Smoothie franchisees, Jean Dunlop and Charles McRae, both of whom testified that California Smoothie made representations to them regarding the sales and profits a franchise would produce.  See id. at 280-355.  Although California Smoothie objected to this testimony, the district court ruled that it was admissible as evidence of "intent" and a "common plan or scheme."  Id. at 283, 307, 517-18.  Subsequently, during argument on the post-trial motions, the court stated that "it became clear at the charge conference" that intent was not an element of a Consumer Fraud Act violation, but it reiterated that the testimony of the two former franchisees was admissible as evidence of California's common plan or scheme or business

---

[0]Moreover, although J & R Ice Cream's brief refers to its non-statutory fraud claim as a common law fraud claim, the complaint identifies it as an equitable fraud claim.  The testimony of the former franchisees was inadmissible for purposes of J & R Ice Cream's equitable fraud claim because although "[a] plaintiff asserting a claim of legal fraud must show that the defendant acted with scienter, . . . a plaintiff advancing a claim of equitable fraud need not demonstrate scienter."  Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1182-83 (3d Cir. 1993) (citations omitted) (applying New Jersey law).  Thus, for purposes of J & R Ice Cream's equitable fraud claim, the testimony of the former franchisees was not admissible as evidence of California Smoothie's intent.  Finally, our discussion below concluding that the testimony was not admissible as evidence of a "common plan" or "scheme" for purposes of the Consumer Fraud Act claim applies with equal force to the equitable fraud claim.  Thus, J & R Ice Cream's contention that the testimony of the former franchisees was admissible at the time it was introduced because J & R Ice Cream was still prosecuting its equitable fraud claim lacks merit.

17

practice of representing sales and profit figures to potential franchisees. Id. at 517.

We review the district court's decision to admit testimony by former California Smoothie franchisees regarding California Smoothie's prior "bad acts" for abuse of discretion. See United States v. Console, 13 F.3d 641, 659 (3d Cir. 1993), cert. denied, 114 S.Ct. 1660 (1994). As we indicated in Console, 13 F.3d at 659 (quoting United States v. Sampson, 980 F.2d 883, 886 (3d Cir. 1992)):

> [f]our guidelines set forth by the Supreme Court govern the admission of prior 'bad acts': '(1) the evidence must have a proper purpose under Rule 404(b); (2) it must be relevant under Rule 402; (3) its probative value must outweigh its prejudicial effect under Rule 403; and (4) the court must charge the jury to consider the evidence only for the limited purpose for which it is admitted.'

Rule 404(b) provides that:

> [e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

The testimony given by Dunlop and McRae was not admissible as evidence of "intent" because, as the district court recognized subsequent to its initial ruling on the evidence, intent is not an essential element of a Consumer Fraud Act violation consisting of an affirmative act. See Fenwick v. Kay American Jeep, Inc., 371 A.2d 13, 16 (N.J. 1977); D'Ercole Sales, Inc. v. Fruehauf Corp., 501 A.2d 990, 996 (N.J. Super. Ct. App.

18

Div. 1985).  There is no doubt that the alleged Consumer Fraud
Act violations in this case consist of affirmative
misrepresentations.

Moreover, the testimony was not admissible as evidence
of a "common plan or scheme."

> Ordinarily, when courts speak of 'common plan
> or scheme,' they are referring to a situation
> in which the charged and the uncharged . . .
> [acts] are parts of a single series of
> events.  In this context, evidence that the
> defendant was involved in the uncharged . . .
> [act] may tend to show a motive for the
> charged . . . [act] and hence establish the
> commission of the . . . [act], the identity
> of the actor, or his intention.

Government of the Virgin Islands v. Pinney, 967 F.2d 912, 916 (3d
Cir. 1992) (citing Edward W. Cleary et al., McCormick on Evidence
§ 190, at 559 (3d ed. 1984)).  Alternatively a "common plan or
scheme" may consist of "incidents [that] were sufficiently
similar to earmark them as the handiwork of the same actor," and
thus constitute "'signature evidence'" of identity.  Id.[0]  "With
the possible exception of prosecutions for conspiracy, plan or
design is not an element of the offense; therefore, evidence that

---

[0]This method of proving identity through the use of other bad
acts is "sometimes labelled proof of 'modus operandi'" and
distinguished from the use of a common plan or scheme to prove
identity.  See 22 Wright and Graham, Federal Practice and
Procedure § 5244, at 501 (1978).

19

shows a plan must be relevant to some ultimate issue in the case." See 22 Wright and Graham, Federal Practice and Procedure § 5244, at 500-01 (1978).

Dunlop and McRae testified that California Smoothie made representations to them regarding the sales and profits they would achieve if they acquired franchises. This testimony was not relevant to an ultimate issue in this case, such as motive, identity or intent. These issues were not in dispute. See Pinney, 967 F.2d at 917. Furthermore, the testimony was not germane to the negligence count. Therefore, the evidence was admitted for "exactly the purpose Rule 404(b) declared to be improper," id., namely to establish the defendants' propensity to commit the charged act. See United States v. Jemal, No. 93-5172, slip op. at 8 (3d Cir. June 21, 1994). The district court acknowledged that it admitted the former franchisees' testimony for this purpose, stating: "in the context of this case, I believe that it was proper to show that it was more likely that representations of sales figures were made to . . . [J & R Ice Cream] by demonstrating that the officials of California Smoothie had a practice of making such representations." See supp. app. at 518. Thus, the district court abused its discretion in admitting this testimony for an improper purpose.

Although J & R Ice Cream contends that the testimony was harmless because it was cumulative and accounted for only half an hour of a two-week trial, see br. at 28-29, we conclude that the testimony was prejudicial because it portrayed California Smoothie as an organization engaged in a large-scale

20

scheme to defraud prospective franchisees by using misrepresentations to persuade them to acquire franchises.[0] Although the testimony of the former franchisees only addressed representations made by California Smoothie regarding the sales and profits that a franchise would produce, we are satisfied that the testimony prejudiced California Smoothie on the two aspects of the Consumer Fraud Act verdict which the testimony did not address directly, the representations with respect to California Smoothie's expertise in site selection and the representation regarding the limitation on the maintenance charges. We take this view because we believe that the jury could have used the highly prejudicial, indeed almost inflammatory evidence to conclude that California Smoothie used misrepresentations in multiple aspects of its sales efforts. At the very least, we cannot say with any confidence that it is highly probable that the error did not substantially affect California Smoothie's rights on all the Consumer Fraud Act issues. See Lippay v. Christos, 996 F.2d 1490, 1500 (3d Cir. 1993). Thus, the district court's abuse of discretion requires reversal of the judgment against California Smoothie on the Consumer Fraud Act count.

---

[0]Moreover, as we noted above, J & R Ice Cream used the testimony of the former franchisees to support this inference in its closing argument, stating, "Did Mr. Keilt make representations to them that they would make specific numbers, whether it be 320 to 350, which I believe was Miss Dunlop's testimony and I think Mr. McRae would make $300,000. That's all that's relevant. From that you can deduce that he probably made the same or similar representations to Mr. Baugher and Mr. Rossetti." See supp. app. at 509.

21

The admission of this testimony does not, however, require reversal of the judgment against California Smoothie on the negligence count because the evidence of California Smoothie's alleged misrepresentations was quite distinct from the evidence supporting the jury's determination that California Smoothie was negligent in its selection of a franchise site and negotiation of a Pompano mall lease. We also point out that there was sufficient evidence supporting this determination.[0]

## C.    Applicability of the Consumer Fraud Act

California Smoothie argues that the district court erred in applying the New Jersey Consumer Fraud Act to the sale and acquisition of a franchise because: (1) purchasers of a franchise are not the "ordinary consumers" that the Act was intended to protect, and (2) a sale of a franchise does not qualify as either a sale of real estate or a sale of merchandise, the only two types of transactions to which the Act applies. J & R Ice Cream answers that California Smoothie should be barred from challenging the applicability of the New Jersey Consumer Fraud Act to this case because "[t]he first time this issue was raised was by way of post-trial motion." See br. at 15.

However, we are satisfied that California Smoothie preserved its objection to the applicability of the Act. As the

---

[0]Moreover, in determining that the district court was correct in finding that California Smoothie assumed the duty to select a franchise site and negotiate a lease for Baugher and Rossetti, we do not rely on the evidence of California Smoothie's misrepresentations to other former franchisees.

22

district court declined to entertain motions for summary judgment, California Smoothie objected to the Act's application to the case in its trial brief, see trial br. at 34 n.9, and cited its trial brief as the basis for its motion for a judgment as a matter of law at the conclusion of J & R Ice Cream's case. Moreover, at the post-trial motions hearing, the district court rejected on the merits California Smoothie's argument that the Consumer Fraud Act improperly was applied to the case, stating to counsel for J & R Ice Cream, "your waiver argument . . . is made very clear. I just, in fact, preferred to decide this on the merits rather than dealing with the waiver issue." Thus, its treatment of the argument suggests that the district court did not believe that California Smoothie had waived the argument. See Griffiths v. CIGNA Corp., 988 F.2d 457, 468 n.8 (3d Cir.) ("because the district court acknowledged during oral argument on the appellants [sic] post-trial motions that the 'contention about the, but for charge, I think that was reasonably well preserved' . . . , we will consider the appellants' exception to the retaliatory discharge instruction on the merits"), cert. denied, 114 S.Ct. 186 (1993); see also Lippay v. Christos, 996 F.2d at 1497 n.8 ("we are satisfied from our review of the record that . . . [appellant] objected on the ground of hearsay at the time of the testimony. Furthermore, the district court noted in its opinion denying . . . [appellant's] motion for a new trial that although 'defendant's counsel objected somewhat belatedly to

the admission of this testimony, [he] nevertheless preserved his objection on the record'").[0]

> The Consumer Fraud Act provides in relevant part that: [t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

N.J. Stat. Ann. § 56:8-2 (West 1989).  The Act defines "merchandise" to include "any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale."  See N.J. Stat. Ann. § 56:8-1(c) (West 1989). It defines "person" to include "any natural person or his legal representative, partnership, corporation, company, trust, business entity or association, and any agent, employee, salesman, partner, officer, director, member, stockholder,

---

[0]We also point out that the district court's case management techniques with respect to declining to entertain motions for summary judgment may have interfered with California Smoothie's ability to raise its objection to the applicability of the Consumer Fraud Act.  Furthermore, it is possible that inasmuch as we are reversing the judgment on the Consumer Fraud Act claim because the court erroneously admitted prejudicial evidence from the former franchisees, California Smoothie might have been able to raise the issue of the applicability of the Act on remand if we ordered a new trial.

associate, trustee or cestuis que trustent thereof." <u>See</u> N.J. Stat. Ann. § 56:8-1(d) (West 1989).

The parties have not cited any Supreme Court of New Jersey cases addressing the application of the Act to the sale and acquisition of franchises. In fact, we are aware of only one case, <u>Morgan v. Air Brook Limousine, Inc.</u>, 510 A.2d 1197 (N.J. Super. Ct. Law Div. 1986), which has addressed the question explicitly. <u>Morgan</u> involved an agreement between Air Brook Limousine and Morgan, providing that Morgan would lease a limousine from Air Brook and accept only limousine rides referred to him by Air Brook. Morgan later filed suit against Air Brook, alleging <u>inter alia</u>, that Air Brook violated the Consumer Fraud Act. Air Brook moved for summary judgment, arguing that the Act applied only to retail consumer sales or advertising and that a franchise did not qualify as merchandise under the Act.

However, the court rejected these arguments and held that the Act applied to the agreement. The court concluded that because the Act's definition of "person" includes business entities and the Act contains no "retail restriction" or definition of the term "consumer," the "Act is not restricted to retail consumer consumption transactions and its protective sweep includes transactions in which a person, like Morgan, makes an investment rather than a consumption purchase." <u>Morgan</u>, <u>id</u>. The court also concluded that "[a]lthough the term 'franchise' is not included within § 1(c)'s definition of 'merchandise,' it is subsumed within the terms 'commodities', 'services' or 'anything

25

offered, directly or indirectly to the public for sale.'"  Id. at 1204.

We also consider a second inferior court case, Kugler v. Koscot Interplanetary, Inc., 293 A.2d 682 (N.J. Super. Ct. Ch. Div. 1972), which involved practices used by a cosmetics manufacturer to recruit distributors for the cosmetics and to promote the sale of distributorships.  The Koscot court held the "referral or pyramid sales practice" employed by the cosmetics manufacturer violated the Consumer Fraud Act as did the misrepresentations made to prospective cosmetics distributors. Id. at 691-92.  Thus, the Koscot court applied the Consumer Fraud Act to the sale and acquisition of cosmetics distributorships. However, the court did so without analysis of the definition of "merchandise" under the Act or reference to the Act's underlying purpose.

We are exercising plenary review over the legal issue of whether the Consumer Fraud Act is applicable.  Nonetheless, "'in the absence of any indication that the highest state court would rule otherwise,'" we must attribute "'significant weight'" to the decisions by the lower state courts.  Nationwide Mut. Ins. Co. v. Budd-Baldwin, 947 F.2d 1098, 1101 n.6 (3d Cir. 1991) (quoting Wisniewski v. Johns-Manville Corp., 759 F.2d 271, 273-74 (3d Cir. 1985)).  In this case, however, we see many indications that the Supreme Court of New Jersey would not adopt the reasoning in Morgan or apply the result in Koscot, and thus we reject a construction of the Consumer Fraud Act's definition of "merchandise" that would include franchises.  See Dillinger v.

26

Caterpillar, Inc., 959 F.2d 430, 435 n.11 (3d Cir. 1992) ("In deciding this case [under Pennsylvania law] we must give due consideration to the decisional law of inferior state courts but we need not give those decisions binding effect. A decision of 'an intermediate appellate state court . . . is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise'") (quoting West v. American Telephone & Tel. Co., 311 U.S. 223, 237, 61 S.Ct. 179, 183 (1940)). See also Blanding v. Pennsylvania State Police, 12 F.3d 1303, 1306 (3d Cir. 1993).

As the Supreme Court of New Jersey stated in Daaleman v. Elizabethtown Gas Co., 390 A.2d 566, 568 (N.J. 1978), the Consumer Fraud Act was "aimed basically at unlawful sales and advertising practices designed to induce consumers to purchase merchandise or real estate." "[T]he legislative concern [underlying the Act] was over sharp practices and dealings in the marketing of merchandise and real estate whereby the consumer could be victimized by being lured into a purchase through fraudulent, deceptive or other similar kind of selling or advertising practices." Id. at 569. Based on this understanding of the purpose of the Act, the court in Daaleman held that the Act did not apply to a privately owned public utility company's alleged overstatement of the costs and quantity of gas it purchased, although the overstatement was reflected in the monthly bills sent to its customers. We recognize that, as J & R Ice Cream points out, this holding also was based on the court's

27

conclusion that inasmuch as the utility operated under the jurisdiction of the Board of Public Utility Commissioners of the State of New Jersey (the "PUC"), "the subject matter of plaintiff's complaint . . . [was] within the exclusive jurisdiction of PUC."  Id. at 570.  This distinction, however, does not undercut the Supreme Court's conclusion that the Act was designed to protect consumers.

Moreover, in an earlier case holding that house-to-house sales of books at an "exorbitant price" was "a fraud . . . within the contemplation" of the Consumer Fraud Act, Kugler v. Romain, 279 A.2d 640, 653–54 (N.J. 1971), the Supreme Court cited the following statement from the legislative history of the Act:

> [t]he purpose of this bill is to permit the Attorney General to combat the increasingly widespread practice of defrauding the consumer.  The authority conferred will provide effective machinery to investigate and prohibit deceptive and fraudulent advertising and selling practices which have caused extensive damage to the public.

Id. at 653 (emphasis added).  This statement of the Act's purpose and the Supreme Court's reading of the Act in Daaleman both indicate that although the Consumer Fraud Act does not define the term "consumer" or contain an explicit "retail restriction," it was intended to protect persons engaging in "consumer" transactions, not those acquiring businesses.

The New Jersey Superior Court, Appellate Division, adopted this reading of the Act in Neveroski v. Blair, 358 A.2d 473 (N.J. Super. Ct. App. Div. 1976), abrogated by Arroyo v. Arnold–Baker & Assocs., Inc., 502 A.2d 106 (N.J. Super. Ct. Law

28

Div. 1985) (abrogating Neveroski in light of the 1976 amendment adding "the sale or advertisement of . . . real estate" to the provisions of N.J. Stat. Ann. § 56:8-2 (West 1989)). Neveroski involved a suit by a home buyer against his real estate broker, the seller of his home, and the termite exterminator, all of whom allegedly concealed the termite damage at the home he purchased. At the time of the sale, the Consumer Fraud Act did not include the term "real estate," and thus the Neveroski court was confronted with the question of whether the term "merchandise" included real estate. The court held that the phrase "anything offered, directly or indirectly, to the public for sale", which is included in the Act's definition of "merchandise," was not a "catch-all phrase" which included real estate, but instead should be "construed under the doctrine of ejusdem generis as a comprehensive definition intended to incorporate other products or services similar in nature to those enumerated by the specific words" which precede it. Id. at 480.

> The court based its holding in part on its considered opinion that the entire thrust of the Consumer Fraud Act is pointed to products and services sold to consumers in the popular sense. Such consumers purchase products from retail sellers of merchandise consisting of personal property of all kinds or contract for services of various types brought to their attention by advertising or other sales techniques. The legislative language throughout the statute and the evils sought to be eliminated point to an intent to protect the consumer in the context of the ordinary meaning of that term in the market place.

29

Id. (first emphasis added).  Moreover, construing the definition of the term "merchandise" under the doctrine of ejusdem generis, the court concluded that real estate did not qualify as "merchandise" under the Act because it "is not included in the definition of the products encompassed by the act, nor is it a commodity which can be considered included within the more general statutory language" of the definition.  Id. at 481.  The court concluded that real estate was not covered by the phrase "anything offered, directly or indirectly, to the public for sale," because "[r]eal estate is wholly foreign to any of the listed examples specifically referred to in the definition."  Id. at 480.

Like the Supreme Court in Daaleman and Romain, and the Appellate Division in Neveroski, we conclude that the term "merchandise" must be construed in light of the overriding purpose of the Act, which was "to protect the consumer in the context of the ordinary meaning of that term in the market place."  Neveroski, 358 A.2d at 480 (emphasis added).  The ordinary meaning of the consumer in the marketplace does not include a purchaser of a franchise.  Moreover, like "real estate," "franchises" are not included expressly in the Act's definition of "merchandise" and are "wholly foreign to any of the listed examples specifically referred to in the definition."  Id. It is true that on January 19, 1976, the New Jersey Legislature amended section 2 of the Consumer Fraud Act to bar the enumerated practices "'in connection with the sale or advertisement of any merchandise or real estate.'"  Id. at 479 n.3 (emphasis added).

30

See Arroyo v. Arnold-Baker & Assocs., Inc., 502 A.2d at 107-08. However, the legislature has not amended the Act to cover franchises. Thus, we hold that J & R Ice Cream is not entitled to a new trial on its Consumer Fraud Act claim because the Act does not apply to the sale and acquisition of a franchise.[0]

We realize that, as the court in Morgan noted, the Consumer Fraud Act's definition of "person" includes business entities. Thus, as the court concluded in BOC Group, Inc. v. Lummus Crest, Inc., 597 A.2d 1109, 1112-13 (N.J. Super. Ct. Law Div. 1990), "[i]t is clear that a corporation may qualify as a person under the Act when it finds itself in a consumer oriented situation," id., such as when it acts as the purchaser of a tow truck, D'Ercole Sales, Inc. v. Fruehauf Corp., 501 A.2d 990, 996-97 (N.J. Super. Ct. App. Div. 1985), as the purchaser of a yacht, Perth Amboy Iron Works, Inc. v. American Home Assur. Co., 543 A.2d 1020, 1024-25 (N.J. Super. Ct. App. Div. 1988), aff'd, 571 A.2d 294 (N.J. 1990), or as the purchaser of computer

---

[0]In its brief J & R Ice Cream argues without citation of authority that "[s]ince the inducement of [J & R Ice Cream by California Smoothie] also involved inducing [J & R Ice Cream] into taking the lease for real property at Pompano, this stands as an independent justification for application of the Act to this transaction." Br. at 37 n.6. While there is authority for the application of the Act to a lease, 316 49 St. Assocs. Ltd. Partnership v. Galvez, 635 A.2d 1013, 1019 (N.J. Super. Ct. App. Div. 1994), in our view this authority is not applicable here because the sublease was merely incidental to the basic relationship between the franchisee, J & R Ice Cream, and the franchisor, California Smoothie. Thus, if J & R Ice Cream had not acquired a franchise there would not have been a sublease. See BOC Group, Inc. v. Lummus Crest, Inc., 397 A.2d 1109, 1112 (N.J. Super. Ct. Law Div. 1990) (services collateral to sale of technology not subject to Act).

peripherals, Hundred East Credit Corp. v. Eric Schuster Corp., 515 A.2d 246, 247-49 (N.J. Super. Ct. App. Div.), certif. denied, 526 A.2d 146 (N.J. 1986). See also Coastal Group, Inc. v. Dryuit Systems, Inc., ___ A.2d ___, No. A-5028-92T5 (N.J. Super. Ct. App. Div. June 23, 1994) (purchase by corporation of prefabricated panels for exterior wall system for condominium project subject to Consumer Fraud Act). However, we conclude that when an individual or a corporation purchases a franchise, it is not a person in a "consumer oriented situation," and thus the transaction is not covered by the Act. In short, it is the character of the transaction rather than the identity of the purchaser which determines if the Consumer Fraud Act is applicable. See, e.g., Daaleman, 390 A.2d at 570 (concurring opinion) (a utility may be subject to Consumer Fraud Act when it sells merchandise though it is not subject to the Act in making computations for monthly service bills).

The BOC Group court's decision that a corporation that purchased technology and certain support services through an "Engineering Services Agreement and Licensing Agreement" was not protected by the Consumer Fraud Act in that transaction supports our decision. The court based its decision on the "'need to place reasonable limits upon the operation of the Act . . . so that its enforcement properly reflects legislative intent,'" id. at 1112 (quoting DiBernardo v. Mosley, 502 A.2d 1166, 1167 (N.J. Super. Ct. App. Div.), certif. denied, 511 A.2d 673 (N.J. 1986)), and the conclusion that the term "merchandise" did not apply to

32

the technology and services acquired in <u>BOC Group</u>, <u>id</u>. at 1112–13.

The court determined that the technology and services acquired in <u>BOC Group</u> were not merchandise because they were not "available to the public at large and sold in large quantities" or "mass produced." <u>Id</u>. at 1113. The court also based its conclusion on the rules promulgated by the New Jersey Division of Consumer Affairs pursuant to the Consumer Fraud Act, N.J. Stat. Ann. § 56:8–4 (West 1989). <u>See</u> <u>BOC Group</u>, 597 A.2d at 1113. "In developing these rules, the Division of Consumer Affairs identified 21 types of consumer transactions for goods and/or services ranging from defective automobile parts to the sale of meat and health club services." <u>Id</u>. <u>See</u> N.J. Admin, Code tit. 13, § 45A–1, <u>et seq</u>. Construing the rules under the doctrine of <u>ejusdem generis</u>, the court concluded that the technology and services acquired in <u>BOC Group</u> bore "no similarity whatsoever to any of these 21 comprehensive definitions," and thus were not covered by the Act. <u>Id</u>.

We conclude that even where franchises or distributorships are available to the public at large in the same sense as are trucks, boats or computer peripherals, they are not covered by the Consumer Fraud Act because they are businesses, not consumer goods or services. They never are purchased for consumption.[0] Instead, they are purchased for the present value

---

[0]As the court in <u>Hundred East Credit Corp.</u> stated, the "generally recognized meaning [of the term 'consumer'] is 'one who uses (economic) goods, and so diminishes or destroys their utilities.'" 515 A.2d at 248 (quoting <u>Webster's New</u>

of the cash flows they are expected to produce in the future and, like the technology and services acquired in BOC Group, bear no resemblance to the commodities and services listed in the statutory definition of "merchandise" or the rules promulgated by the Division of Consumer Affairs.[0]  Thus, J & R Ice Cream is not entitled to a new trial on its Consumer Fraud Act claim.

### D.    The Negligence Count

The district court deferred ruling on a motion in limine regarding whether California Smoothie had a duty to select a franchise site and negotiate a lease for Baugher and Rossetti. See supp. app. at 12.  Subsequently, the district court ruled that California Smoothie had assumed this duty,[0] and instructed the jury accordingly, see id. at 511-12.  While California Smoothie, citing Rustay v. Consolidated Rail Corp., 775 F. Supp. 161, 163 (D.N.J. 1991), concedes that the court was required to

---

International Dictionary, 2d edition).  Under this definition, the purchaser of a franchise does not qualify as a "consumer" because its use of the franchise does not "diminish" or "destroy" the franchise's "utilities."  We point out, however, that some consumer goods may not be diminished or destroyed through use and that our result is not dependent on the acceptance of this definition.

[0]In BOC Group the court suggested that the sale of "franchises" could be subject to the Consumer Fraud Act.  597 A.2d at 1112. But this statement was not necessary to its opinion and apparently the court included it because it had cited Morgan which it did not find controlling.  Thus, we do not find the reference to franchises in BOC Group to be significant.

[0]Neither party has pointed us to the precise point in the record reflecting this ruling, but both parties proceed on the basis that the court made it.

34

determine whether it had the duty, it urges that the court erred in its conclusion.

California Smoothie makes a strong paper argument that its relationship with Baugher and Rossetti, and thus with J & R Ice Cream as their assignee, was primarily contractual as it was based on the Site Selection Agreement and the Franchise Agreement. See br. at 42-43. The Site Selection Agreement provides that California Smoothie grants Baugher and Rossetti "the right to obtain a Franchise to establish and operate a Restaurant if . . . [they] (a) identif[y] a specific location for the restaurant within the Assigned Area and (b) obtain[] the Franchisor's approval of the site." See app. at 179-80. Thus, Baugher and Rossetti were contractually responsible for proposing a site, and California Smoothie retained the right to reject the proposed site based on certain criteria identified in the agreement. The agreement also provides that within 30 days of California Smoothie's approval of the site, Baugher and Rossetti must negotiate a lease for the site, and that this lease must be approved in writing by California Smoothie. Id. Finally, the agreement provides that upon request from Baugher and Rossetti, California Smoothie will provide "any additional guidelines and reasonable site selection assistance and counseling." Id. Thus, the Site Selection Agreement does not impose a duty on California Smoothie to select a site for Baugher and Rossetti or to negotiate a lease for their site.

However, even where a relationship is "essentially contractual [in] nature," a party may be "subject to a negligence

35

action if the 'act complained of was the direct result of duties voluntarily assumed . . . in addition to the mere contract.'" Walker Rogge, Inc. v. Chelsea Title & Guar. Co., 562 A.2d 208, 221 (N.J. 1989) (quoting Brown's Tie & Lumber v. Chicago Title Co., 764 P.2d 423, 426 (Idaho 1988)); see also Gudnestad v. Seaboard Coal Dock Co., 99 A.2d 201, 204 (N.J. Super. Ct. App. Div. 1953), aff'd in part and rev'd in part on other grounds, 104 A.2d 313 (N.J. 1954) ("[i]t is undoubtedly the established rule of law that one who in the absence of a legal obligation to do so voluntarily undertakes to render a service for the protection of the safety of another may become liable to him for the failure to perform or the failure to exercise reasonable care in the performance of that service, although the volunteer is not the owner or in control of the property with respect to which the service is to be performed"). As the district court concluded, the record indicates that the site selection and lease negotiation processes did not follow the pattern described in the Site Selection Agreement. California Smoothie concedes that it already had selected the Pompano mall site and negotiated a lease for the site prior to the execution of the Site Selection Agreement. See br. at 43 n.42.

Moreover, the evidence indicates that when California Smoothie selected and leased the Pompano mall site: (1) California Smoothie intended to sublease it to a prospective franchisee, see supp. app. at 137; and (2) already had begun negotiations with Baugher and Rossetti regarding their acquisition of a franchise in Florida and suggested the Pompano

36

mall site to them. The evidence also indicates that Keilt made a deliberate decision not to include Baugher and Rossetti in negotiations for the lease, see supp. app. at 383-84. Thus, we conclude that the district court did not err in holding that California Smoothie assumed a duty to select the Pompano mall site for Baugher and Rossetti and to negotiate the lease for them. As a result, we will affirm and reinstate the jury's verdict on the negligence count and will remand the matter to the district court to enter judgment against California Smoothie on that count.

### III. CONCLUSION

In view of the foregoing discussion, we will reverse the judgment of July 20, 1993, in favor of J & R Ice Cream on the Consumer Fraud Act count and will remand the matter to the district court for entry of a judgment in favor of CSI and CSLC on that count and for entry of a judgment for $55,000 in favor of J & R Ice Cream on the negligence count with prejudgment interest up to and including July 20, 1993.[0] Thereafter interest shall accrue on the judgment. See Fed. R. App. P. 37. On the remand,

_____

[0]In its brief, California Smoothie does not ask for any relief with respect to the attorney's fee awarded in the judgment entered July 20, 1993, to J & R Ice Cream under N.J. Stat. Ann. §56:8-19 (West 1989). Consequently, we do not deal with those fees even though the basis for them has been eliminated. Of course, we do not preclude California Smoothie from moving under Fed. R. Civ. P. 60(b) for an order vacating the fees. We also note that California Smoothie indicates that "[a]s a result of the jury's finding, the jury was not permitted to consider CSLC's counterclaims, which were dismissed." CSLC does not seek a reinstatement of the counterclaims, and thus we do not consider them.

J & R Ice Cream may move for reinstatement of its equitable fraud claim. J & R Ice Cream's cross-appeal from the denial of prejudgment interest on the Consumer Fraud Act judgment and from the striking of its judgment based on negligence is dismissed as moot. The parties will bear their own costs on this appeal.