**R.J. LONGO CONSTRUCTION CO., INC., d/b/a EPIC, Plaintiff,**

v.

**TRANSIT AMERICA, INC., et al., Defendants.**

**Civ. No. 93–3355(JCL).**

United States District Court, D. New Jersey.

April 10, 1996.

William A. Feldman, Feldman & Fiorello, Wayne, NJ, for Plaintiff.

John J. Levy, Stephen W. Armstrong, Montgomery, McCracken, Walker & Rhoads, Cherry Hill, NJ, Mary Catherine Brown, Buchanan Ingersoll, Princeton, NJ, for Defendants.

## OPINION

LIFLAND, District Judge.

Defendant Transit America, Inc. ("Transit America") has moved for partial summary judgment dismissing Counts One, Two and Four of R.J. Longo Construction Co., Inc., d/b/a EPIC's ("EPIC") Second Amended

Complaint.[1] These counts include claims for breach of contract, breach of warranty, and consumer fraud under the New Jersey Consumer Fraud Act, N.J.S.A. 56:8–1 et seq. For the reasons articulated on the record on March 11, 1996, as more fully explicated below, the Court grants in part and denies in part Transit America's motion.

## Background

This suit concerns specialized rail cars EPIC contracted to purchase from Berwick Freight Car Corporation ("Berwick"), the design for which was generated by Transit America and licensed exclusively to Berwick as manufacturer. The representations, assurances, and overall role of Transit America regarding the rail cars sold to EPIC are at issue in this litigation. It is also disputed whether Transit America should have originally designed the cars to include end of car cushioning, rather than draft gears—alternative mechanisms to absorb force exerted on the car during impact.

The controversy had its genesis in late 1990 and early 1991, when EPIC, a joint venture between R.J. Longo Construction Co., Inc. and Virotech Systems, Inc.,[2] entered into several written contracts to facilitate performance of a contract to haul dewatered sludge awarded to EPIC by the Passaic Valley Sewage Commission ("PVSC"). See Second Amended Complaint at ¶ 3; Def's 12(G) Statement, Ex. 1. EPIC executed contracts to buy rail cars, containers, tractor-trailers and other equipment necessary to transport the PVSC sludge by rail from Newark, New Jersey to landfills in Texas and Illinois, entered into agreements with railroads to transport the rail cars over their lines and leased railyards in Newark and Tyler, Texas. EPIC also executed written lease agreements with landfill operators in Texas and Illinois.

EPIC's contract with Berwick, the Ultra[3] car manufacturer, was effective as of January 17, 1991, but not fully executed until February 19, 1991.[4] It is undisputed that Transit America was not formally a party to the purchase agreement. There is also no dispute that EPIC never entered into any written contract with Transit America, which agreed in a December 19, 1990 Letter of Agreement to license its design exclusively to Berwick. However, there is a dispute as to whether Transit America worked jointly with Berwick to market the cars, and made representations to EPIC upon which plaintiff relied in entering into the rail car purchase contract.

### Transit America's Role in the Marketing of the Ultra Car to EPIC

Berwick and EPIC negotiated their rail car purchase contract in the last quarter of 1990. A November 1, 1990 letter from Robert Longo to Walter Pogue, then President of Berwick, thanked Pogue for meeting with him the week before and explained that in the next few days, after receiving relevant information from Consolidated Rail Corp. ("Conrail"), EPIC would "commit to the number of 132 ton articulated cars that we need." Def's 12(G) Statement, Ex. 2. See also id., Ex. 6. On November 7, 1990, Longo wrote a letter expressing EPIC's intent to

1. Although leave to file the Second Amended Complaint was not granted until after Transit America filed this motion, the Court construes the motion as one for summary judgment on the Second Amended Complaint.

2. Longo Construction and Virotech dissolved their joint venture in 1993, with Longo Construction retaining all rights to the Passaic Valley Sewage Commission contract, the name "EPIC", and all claims formerly belonging to the joint venture, including those involved in this litigation.

3. The Ultra car is a two-unit "articulated" railcar, meaning that it has two halves that are permanently joined together and pivot at the middle set of wheels or "trucks". The railcar is sometimes described as a "skeleton" or "spine" car because its design calls for a center sill or "spine", and outriggers that support the containers. The car does not have floors or sides.

4. EPIC received certain written guarantees from Berwick's parent and sister corporations, which all have subsequently filed for bankruptcy protection. EPIC did submit a claim to the bankruptcy court for $9,263,226.79, precisely the amount EPIC asserts Transit America owes on eight of the nine damages claims at issue in this action.

purchase 80 rail cars from Berwick.[5] *See id.*, Ex. 6.

There is record evidence that Transit America was an active participant in the marketing of the Ultra car to EPIC. A letter from Berwick to Ellison Wefel of Conrail, written on March 5, 1992, when Berwick was trying to work out the structural problems with the car, explains that "[w]hen developing the initial proposal to EPIC, Transit America and Berwick believed that their customer best would be served by utilizing high capacity draft gears for several reasons...." Feldman Cert., Ex. B. "Their customer" is a clear reference to EPIC. *See* Wefel Dep. (Feldman Cert., Ex. C) at 568:15–20. Robert Longo's deposition testimony corroborates that Transit America pitched its design to EPIC.

Q) And do you recall when that meeting occurred?

A) I believe there was a meeting right here in this room. And I believe Mike Pavlick (the Transit America Manager of Freight Car Products Operation) was with Walter Pogue, and they presented a schematic and set of preliminary plans.

Q) When was that meeting?

A) I don't remember the exact time.

Q) Can you tell me the year?

A) It was '90, late. It was sometime between October and I would say probably December.

. . . . .

A) Mr. Pavlick, at the first meeting I had with him, stated that he had the experience to build it. He told me about cars he had worked on and the car would meet the requirements of the AAR. It would be designed in accordance with AAR standards.

. . . . .

A) Each one of them [Pogue and Pavlick] agreed that they would have interchange approval, that they would have AAR ap-

proval,[6] that it would be built to standards of the—*and I wanted those assurances because I was spending $12 million for these rail cars.*

Q) So as I understand it, you don't recall which man made which statement; is that correct?

A) I think they both made those statements at different times during the meeting.

Longo Dep. (Pl's 12(G) Statement, Ex. C) at 104:11–22; 115:17–22; 118:23–119:7 (emphasis added).

Walter Pogue's deposition testimony also supports the inference that Transit America made representations to EPIC in its effort, jointly with Berwick, to market the Ultra car to EPIC.

Q) Was there a discussion with Mr. Longo or Mr. Bernardi, or both of them, about the car being built or being designed, or both, to AAR requirements?

A) Yes, that was in the original Mike Pavlick description. It was a document that Mike Pavlick produced that describes the philosophy and the basis for the design. It's very clearly to meet AAR requirements.

. . . . .

Q) Can you tell me when that was produced by Transit America?

A) Well, it was all around December—November, December time frame, I think. I'm sure it's in the documents somewhere, but it was—I think it accompanied that specification outline, the original specification outline, if I'm not mistaken.

. . . . .

Q) At this time you didn't tell Pavlick or Transit America who your potential customer was, did you?

A) Mike Pavlick was involved in the Longo project right from the beginning. As far as I know, he was—he knew we were talking to EPIC right from the beginning.

5. EPIC would ultimately agree to purchase 200 railcars, but in the end bought just 150.

6. The AAR, the Association of American Railroads, is a standard setting organization that, *inter alia*, reviews rail car design prototypes to

determine whether the car satisfies safety standards and can operate on different rail systems. Full interchange approval means that a car can operate on any system throughout the country.

To the best of my knowledge, there was never any—because I think we went up together at some point when we started proposing the car, I think the first thing we did is Mike and I went up to see Rob [Longo] and Rich [Bernardi, Virotech President].

Q) He's not identified in any of your meetings with the Longo people?

A) I'm trying to remember what—when that first meeting was with Mike.

Q) It should be related in your log?

A) It should be, unless I missed-unless I failed to put it in there.

Pogue Dep. (Pl's 12(G) Statement, Ex. F) 123:22–124:5; 124:12–19; 197:17–198:11.

On January 17, 1991, before Robert Longo signed the Rail Car Sales Agreement, Mike Pavlick of Transit America faxed him a letter that represented to EPIC that "Transit America's Freight Car Products Operation currently ha[d] a letter arrangement with the Berwick Freight Car Company providing them with exclusive manufacturing rights to [their] 2 unit articulated container car design." Longo Cert., Ex. B; Longo Dep. at 131:22–132:11.[7] EPIC alleges that it detrimentally relied on this and other representations, including that the car would meet AAR approval and that Transit America would undertake to obtain AAR approval for the car.

**Representations Regarding AAR Approval**

Turning first to the allegation that Transit America represented to EPIC that the rail car design would garner AAR approval, there is evidence that such representations were made before and after EPIC signed the Rail Car Sales Agreement with Berwick. According to Robert Longo:

A) Mr. Pavlick, at the first meeting I had with him, stated that he had the experience to build it. He told me about cars he had worked on and the car would meet the requirements of the AAR. It would be designed in accordance with AAR standards.

. . . . .

A) Each one of them [Pogue and Pavlick] agreed that they would have interchange approval, that they would have AAR approval, that it would be built to standards of the—*and I wanted those assurances because I was spending $12 million for these rail cars.* (emphasis added).

Longo Dep. at 118:23–119:7. He further testified that representations were made before and after execution of the Berwick/EPIC contract:

Q) Were there any discussions before or at the time that the contract was executed about the representation alleged in Paragraph 4 that the design shown in the specifications and drawings meets all requirements, laws, codes and regulations applicable to the railroad car?

A) Yes. They promised that the car would meet the AAR standards. There was subsequent written correspondence from Mike Pavlick saying that the car would meet AAR approval by the end of '91. At all. times before, during and after, it was always my impression that the cars were going to meet AAR standards and any other code applicable.

*Id.* at 193:21–194:11. *See also* Longo Cert., Exs. D–F. The testimony of Lawrence Fort, Transit America's Vice–President of Operations, buttresses Longo's testimony:

Q) Did Longo require of your company written verifications of the fact that the rail cars would meet AAR requirements?

In my mind they were a party to it inasmuch as the same day that the contract was signed I received a letter from Mike Pavlick stating that they were the exclusive broker—exclusive— that Berwick was the exclusive builder of the car. They had exclusive license to build the car subject only to the fact that if they didn't build—if they did not provide the cars to us, we can go back and get the cars built by somebody else. Longo Dep. at 131:22–132:8.

---

**7.** The letter also states that if Berwick could not meet EPIC's production requirements, Transit America would be willing, upon Berwick's release, to enter into an agreement with another AAR certified car builder. But the letter itself made no representation that Transit America would pursue AAR full interchange approval for the car. Still, according to Longo's deposition testimony, the faxed letter somehow suggested to him that Transit America was a party to the Rail Car Sales Agreement:

A) That they were to the AAR specifications, yes. Well, I don't [sic] whether he wrote that specifically, but—I believe, we said that the—the—the cars would be to AAR—AAR specifications.

Fort Testimony (Pl's 12(G) Statement, Ex. I) at 54:2–7. So does Walter Pogue's testimony:

> Q) Was there a discussion with Mr. Longo or Mr. Bernardi, or both of them, about the car being built or being designed, or both, to AAR requirements?
>
> A) Yes, That was in the original Mike Pavlick description. It was a document that Mike Pavlick produced that describes the philosophy and the basis for the design. It's very clearly to meet AAR requirements.

Pogue Dep. at 123:22–124:5.

### Representations About AAR Full Interchange Approval Process

It is contrary to standard industry practice for the designer, rather than the manufacturer, to pursue AAR interchange approval.[8] Nonetheless, there is substantial evidence that Transit America represented to EPIC and Berwick that Transit America would secure the requisite approval. Robert Longo testified that Transit America made such representations and assurances · to EPIC "[b]efore, during and after" execution of the Berwick/EPIC contract. Longo Dep. at 210:2. Walter Pogue's deposition testimony corroborates Longo's recollection:

> Q) The next item says, "AAR certified", and has a star beside it, or some sort—
>
> A) Yes, yes.
>
> Q) —sort of a mark. What was discussed in the meeting on that subject?
>
> A) Well, that would be the certification process which Mike Pavlick would have been involved in, but—Mike was responsible to get the car certified and do what he needed to do with AAR to get it certified. Arrange testing, and everything.

Q) When you say Mike was responsible to get the car certified, what's your basis for that?

A) Well, the basis for what he agreed to do; under the license agreement with Transit America, was to build a prototype, have it tested, and obtain certification for the car.

Q) At this time Berwick did not have a license agreement, did it?

A) We had a draft agreement—well, we had a letter agreement.

. . . . .

Q) Under the license agreement Transit America was obligated to build a prototype, get the car tested, get certification for the car. And I'd like you to show me the specific language in this document that creates those responsibilities.

. . . . .

A) No, I never intended to say it was exclusively on the license agreement. This is what was agreed to verbally.

Q) What was agreed to verbally?

A) That Transit America would build a prototype and have it tested.

Q) And have the prototype tested.

A) Yes; and obtain certification. That was all under an understanding, because Berwick Freight Car had no way of doing that. Transit America was the only party who could possibly do that. I mean that was a foregoing [sic] conclusion as a basis for a license agreement, and the license agreement was based on the fact that that's what would be done, but did not specifically say that. This [the licensing agreement] is primarily what provides for the royalty payment.

. . . . .

A) [T]he understanding was that the only way this whole thing could come about was if Transit America did in fact design the car, build a prototype, have it tested in accordance with AAR requirements, *in effect be the engineering arm of Berwick*

---

**8.** *See* Wefel Dep. at 564:14–18 ("I believe that I remember the fact that under traditional circumstances, it would have been the freight car builder to get those AAR approvals, but in this particular instance, that Transit America was arranging it."); Lawrence H. Fort testimony at a page with illegible number:2–5.

*Freight Car Company* that does—gets the certification.

. . . . .

Q) Did you have any involvement in the application for AAR certification?

A) Not for the car.

Q) Who handled that on behalf of Berwick?

A) Mike Pavlick.

Q) He didn't work for Berwick.

A) True.

Q) Who—was there an employee at Berwick, or officer at Berwick who had responsibility if that failed?

A) Well, technically, the chief engineer, Rick Nelson, would have, but I don't know that he was involved in any way. To the best of my recollection, all of the correspondence with AAR was prepared by Mike Pavlick.

Pogue Dep. at 125:19–126:20; 127:4–11; 127:17–128:14; 133:6–13; 137:8–24. And finally, the testimony of Robert Boudreau, an EPIC official, further evidences that Transit America represented that it would obtain AAR certification for the prototype:

Q) And then you came back to Deb Cicero (EPIC's Bank of Tokyo loan contact), and did you explain to her at that time that AAR full interchange approval was not something that was going to happen in the very near future?

A) To the contrary.

Q) What did you explain to her?

A) I explained to her what Mike Pavlick told me, and convinced me of, and that was, he said it won't take long, no problem, no problem. I mean, that was ... I just remember him constantly making it sound like, you know, oh, don't worry about it. We can get the approval. It will only take a couple months.... Mike Pavlick did everything he could to convince me so I could convince the bank that it would be like no problem, and it'd be done right away.

**9.** As of January 1996, approval had not been obtained, despite significant costs EPIC has allegedly incurred in completing the applications

Boudreau Dep. (Pl's 12(G) Statement, Ex. J) at 84:11–90:25. *See also* Wefel Dep. at 510:9–23; 563–564; Henry Parrish Dep. (Pl's 12(G) Statement, Ex. H) 131:14–18.[9]

## Problems With the Cars and the EPIC/Berwick Release

The cars were originally designed to carry six containers and had draft gears as the mechanism designed to absorb force caused by impacts during coupling and other use. However, Conrail's special requirements, more stringent than AAR standards, would not permit a six-container configuration absent end of car cushioning. This created a rift between Berwick and EPIC as Berwick demanded additional payment to cover the cost of the cushioning. To reconcile this conflict, on August 2, 1991, Berwick and EPIC executed an Agreement amending the January 17, 1991 Rail Car Sales Agreement, *see* Def's 12(G) Statement, Ex. 10, and containing the following recital:

"Whereas, the parties have disagreed as to the sufficiency and appropriateness of the use of draft gear coupling equipment or design, and whether alternative coupling design, such as end of car cushioning ("EOCC") is needed in order to fulfill the performance parameters specified, the parties wishing to resolve the present impasse while otherwise reserving certain rights as between them for resolution in arbitration ... agree as follows...."

*See* Def's 12(G), Ex. 10. Under the Amended Agreement, EPIC covenanted to pay an additional $2,000 for each car equipped with EOCC.

Then on June 5, 1992, they signed a Settlement Agreement that resolved disputes concerning the addition of reinforcing bars, hoods and plates to the center sills of the rail cars, required because of Transit America's allegedly faulty design. *See id.*, Ex. 13. The purpose of both agreements was to settle certain issues between the two: "Specifically, EPIC settled certain issues with Berwick in a tradeoff for uncollectible claims, as Berwick was insolvent. Additionally, EPIC avoided

and pursuing the approval. *See* Longo Cert. at ¶ 15.

potentially expensive litigation on ridiculous claims by Berwick of approximately $1.6 million." Longo Cert. at ¶ 16. On their faces, the agreements did not purport to settle claims with Transit America and, in fact, the June 5, 1992 Settlement required that "[i]n cooperation with Transit America, Inc., Berwick agrees to have successfully completed on or before November 30, 1992, any remaining tests for the Ultra rail car that the AAR has advised . . . are required. . . ." *See* Def's 12(G) Statement, Ex. 13. Both agreements preserved claims for future warranty obligations (specifically Berwick's design and manufacture warranty).

### EPIC's Damages Claims in this Litigation

The Ultra cars have encountered problems that have imposed additional costs on EPIC. It enumerates nine damages claims: 1) $300,-000 for the cost of adding end of car cushioners to 150 Ultra cars necessitated by Conrail's determination that draft gears were insufficient to prevent car damage at the speed expected for normal operation; 2) $389,952 in extra transportation costs incurred due to the changeover from draft gears to end of car cushions; 3) $426,250 for the cost of center sill reinforcements and inspections precipitated by the failure of one of the cars on November 5, 1991; 4) $267,241 for the rental cost of gondola cars needed after Conrail and Southern Pacific refused to pull the Ultra car due to the defective center sill; 5) $228,825 in additional costs incurred because the defective center sill design reduced the maximum Ultra car payload to four, rather than six, containers; 6) $145,000 for the cost of AAR tests; 7) $300,000 incurred to pay for the retrofitting of the cars with hydraulic stabilizers; 8) $7,202,060 in lost business due to the failure of Transit America to timely obtain AAR approval; and 9) $303,928.01 to repair cracks in the center sill of the Ultra car discovered on March 4, 1994. *See* Def's 12(G) Statement, Ex. 35 and Heath Supp. Cert., Ex. B. As stated above, EPIC submitted the first eight claims in the Berwick bankruptcy proceeding.

### Discussion

 Summary judgment is not a disfavored procedural shortcut, but rather an essential thread in the fabric of the Federal Rules that eliminates unfounded claims without recourse to a costly and lengthy trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed.R.Civ.P.* 56(c). The burden of showing that no genuine issue of material fact exists rests initially on the moving party. *See Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir. 1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). "This burden . . . may be discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. at 325, 106 S.Ct. at 2554. All evidence submitted must be viewed in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

██ ██ Once a properly supported motion for summary judgment has been made, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Fed.R.Civ.P.* 56(e); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). No issue for trial exists unless the nonmoving party can demonstrate sufficient evidence favoring the nonmoving party such that a reasonable jury could return a verdict in that party's favor. *See id.* at 249, 106 S.Ct. at 2510.

### I. Liability Issues

#### A. Breach of Contract

Transit America contends that the basic elements for contractual liability—offer, acceptance, and consideration—do not exist so it could not, as a matter of law, have breached a contract with EPIC. It underscores that in connection with EPIC's contract to purchase rail cars, EPIC sought and received guarantees from Berwick's parent and sister corporations, as well as certain limited war-

ranties from Berwick, indicating that it knew how to execute written contracts to assign rights and obligations, value goods and services, and assign risks. Transit America did not sign any of these contracts, and EPIC has not identified the terms of any alleged contract that may have been created by the letters and other communications between Transit America and EPIC.

EPIC concedes that there is no document entitled "Contract Between Transit America and EPIC". But it maintains that "there [were] a series of representations, assurances, promises, undertakings and inducements by Transit America (and/or Budd), often acting together with Berwick, on which EPIC relied to its detriment." Pl's Br. at 13. EPIC wants the Court to look at the whole relationship, the series of documents and the various representations made, rather than each document in isolation.

Viewed in a light most favorable to the non-moving party, see *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356, the record suggests that the Berwick–Transit America–EPIC relationship may have been a complex trilateral relationship rather than two separate bilateral contracts with Berwick as the vertex, obligated to EPIC and Transit America by wholly separate agreements. Because Transit America's argument fails to consider the tenor of the entire relationship, the Court considers it formalistic and unpersuasive.

There is ample support for EPIC's theory that it bought an adequate rail car design, the testing of cars and the AAR full interchange certification that was critical to the economics of its car purchase. The Longo, Pogue and Boudreau deposition testimony, in addition to the numerous documents made part of the record, create genuine issues of fact that Transit America was intimately involved in the marketing of the Ultra car to EPIC. See, e.g., Feldman Cert., Ex. B; Longo Dep. at 104:11–22; 115:17–22; 118:23–119:7. There is substantial evidence from which the trier of fact could conclude that this involvement included promises, assurances and representations that Transit America would procure AAR certification for the prototype. The Pogue testimony is especially significant in this regard because it

indicates that Transit America may have assumed contractual obligations based on oral representations to Berwick and EPIC that were never memorialized in a written agreement. See Pogue Dep. at 125:19–126:20; 127:4–11; 127:17–128:14; 133:6–13; 137:8–24. Furthermore, the statement that Transit America was effectively operating as Berwick's "engineering arm" lends credence to Robert Longo's testimony that he believed Transit America was a party to the EPIC/Berwick contract. See id. at 133:6–13.

The question remains, however, under what legal theory can EPIC be said to have bought the design and AAR certification services and Transit America to have breached a contract? To the frustration of both Transit America and the Court, EPIC has been reluctant to specify what doctrinal framework is most appropriate. Instead, its breach of contract argument is like a quilt weaving together swatches of express contract, implied-in-fact contract, promissory estoppel and third party beneficiary doctrine. Although before trial EPIC must explicitly articulate the legal theory or theories under which it claims an entitlement to contract damages, at this stage the record could support a promissory estoppel or implied-in-fact contract claim, as well as EPIC's contention that it was an intended third party beneficiary of the licensing agreement between Berwick and Transit America. The Court also holds that New Jersey law governs whether a contract creates direct obligations running from Transit America to EPIC.

### 1. Choice of New Jersey Law

■ As a federal court exercising diversity jurisdiction, this Court must apply the substantive law of the forum state, see *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), including the forum's choice of law rules. See *Klaxon Co. v. Stentor Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *NL Industries, Inc. v. Commercial Union Insurance Co.,* 65 F.3d 314, 324 (3d Cir.1995). Although recourse to the law of the place where the contract was entered (*lex loci contractus*) is often sufficient to resolve choice of law problems in contract cases, New Jersey courts have rejected mechanical application of this rule and

consider the factors enumerated in the Restatement (Second) of Conflict of Laws § 6 [10] to determine the jurisdiction with the most significant relationship to the parties and the transaction. *See Gilbert Spruance Co. v. Pennsylvania Mfrs. Ass'n Ins. Co.*, 134 N.J. 96, 629 A.2d 885 (1993); *State Farm Mut. Auto Ins. Co. v. Simmons' Estate*, 84 N.J. 28, 417 A.2d 488 (1980); *Rohm & Haas Co. v. Adco Chemical Co.*, 689 F.2d 424, 429 (3d Cir.1982); *Pancza v. Remco Baby Inc.*, 761 F.Supp. 1164, 1168 (D.N.J.1991); Restatement (Second) of Conflict of Laws § 188.

■ New Jersey has the most significant relationship to any contract that is deemed to exist between Transit America and EPIC. Transit America, in conjunction with Berwick, marketed its rail car design to EPIC by sending letters and faxes to, and attending meetings in, New Jersey. *See* Longo Cert., Exs. B, D–F; Longo Dep. at 104:11–22; 115:17–22; 118:23–119:7; Pogue Dep. 123:22–124:5; 124:12–19; 197:17–198:11. The reason EPIC even participated in such negotiations, as understood by all the players in this drama, was to fulfill its public contract to haul PVSC waste, which federal and state law no longer permitted to be disposed of via ocean dumping. *See* Def's 12(G) Statement, Ex. 1. Indeed, New Jersey's overriding interest in the subject matter of the contract is evidenced by the legislature's finding that "disposal ... of solid waste is a matter of grave concern to all citizens and is an activity thoroughly affected with the public interest." N.J.S.A. 13:1E–2(a). More generally, New Jersey has a profound interest in protecting the contractual rights of its citizens, especially where enforcement of its law will not contravene the policies of other interested states such as Pennsylvania. Thus, the relevant policies of the forum state, the reason-able expectations of the parties, and the policies that pervade contract law all indicate that New Jersey has the most significant relationship to any contract that is found to exist between EPIC and Transit America.

### 2. Promissory Estoppel [11]

■ Promissory Estoppel obviates plaintiff's need to establish the formal elements of a contract. Where the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee, and does induce such action, *see* Restatement (Second) of Contracts § 90, "a promisor is barred from denying enforceability of his promise for lack of consideration." *Ballard v. Schoenberg*, 224 N.J.Super. 661, 666, 541 A.2d 258 (App.Div.), *certif. denied*, 113 N.J. 367, 550 A.2d 473 (1988). As under the Restatement, in New Jersey the circumstances are ripe for application of promissory estoppel when: 1) there is a clear and definite promise by the promisor; 2) the promise was made with the expectation that the promisee will rely on it; 3) the promisee must in fact reasonably rely on the promise; and 4) detriment of a definite and substantial nature must be incurred in reliance on the promise. *See Royal Associates v. Concannon*, 200 N.J.Super. 84, 91–92, 490 A.2d 357 (App.Div.1985) (citing *Malaker Corp. Stockholders Protective Committee v. First Jersey Nat. Bank*, 163 N.J.Super. 463, 395 A.2d 222 (App.Div.1978), *certif. denied*, 79 N.J. 488, 401 A.2d 243 (1979)).

■ A reasonable jury, resolving all inferences in the nonmovant's favor, could conclude that Transit America promised EPIC that the rail car design would satisfy AAR requirements and that it would shepherd the

---

10. According to § 6, the "general considerations germane to a court's conflict-of-law analysis" are:

 1) the needs of the interstate and international systems;
 2) the relevant policies of the forum;
 3) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue;
 4) the protection of justified expectations;
 5) the basic policies underlying the particular field of law;

 6) certainty, predictability, and uniformity of result; and
 7) ease in the determination and application of the law to be applied.

11. Although EPIC did not explicitly plead promissory estoppel in its Second Amended Complaint, the Court suggested at oral argument that this basis for Transit America's liability presented triable issues of fact. The magistrate has subsequently granted EPIC leave to amend its Second Amended Complaint to include a promissory estoppel count.

prototype through the certification process. Whether EPIC reasonably relied on these assurances to its detriment is a question for the jury, but the record supports the inference that it would have looked elsewhere to satisfy its rail car needs had Transit America not provided the assurances and representations. On January 17, 1991, before EPIC signed the purchase agreement with Berwick, the prototype was untested so EPIC was arguably taking a gamble. This reliance may ultimately have caused damage as the rail cars performed inadequately and the promise of AAR full interchange certification remains unfulfilled.

### 3. Implied-in-Fact Contract [12]

 Another thread, also not clearly developed by EPIC but arguable on this record, is that an implied-in-fact contract existed between EPIC and Transit America. An implied-in-fact contract " 'is in legal effect an express contract, and varies from the latter only insofar as the parties' agreement and assent thereto have been manifested by conduct instead of words.' " *Saint Barnabas Medical Center v. Essex County*, 111 N.J. 67, 77, 543 A.2d 34 (1988) (quoting *St. Paul Fire & Marine Ins. Co. v. Indemnity Ins. Co. of North America*, 32 N.J. 17, 23, 158 A.2d 825 (1960)). *Accord* Restatement (Second) of Contracts § 4, comment a ("A promise may be stated in words either oral or written, or may be inferred wholly or partly from conduct."). Thus, where the parties' conduct or "circumstances surrounding their relationship" support a finding of mutual agreement and intent to promise, *see Wanaque Borough Sewerage Authority v. Township of West*

*Milford*, 281 N.J.Super. 22, 29, 656 A.2d 448 (App.Div.), *certif. granted*, 142 N.J. 458, 663 A.2d 1363 (1995), a court will imbue the promise with the binding force of law. The array of written and oral representations and understandings surrounding the Transit America/EPIC relationship could very well convince a jury that Transit America intended to contract with EPIC to provide engineering services that would render viable the Ultra cars EPIC contracted to purchase from Berwick.

### 4. Third Party Beneficiary

EPIC also claims to be a third party beneficiary of the Berwick/Transit America contract, a tenable theory even under Pennsylvania law, which Transit America asserts governs its contract with Berwick.[13] According to Transit America, Pennsylvania third party beneficiary law is uncommonly clear and requires that the obligation to the third party affirmatively appear in the contract itself. *See Spires v. Hanover Fire Insurance Co.*, 364 Pa. 52, 57, 70 A.2d 828 (1950). Neither party seems to recognize, however, that *Spires* did not survive unscathed from the date of rendition until today. The Pennsylvania Supreme Court has twice in the past 13 years revisited the third party beneficiary doctrine, "overrul[ing] *Spires* to the extent that it states the exclusive test for third party beneficiaries." *Guy v. Liederbach*, 501 Pa. 47, 60, 459 A.2d 744 (1983).

In *Guy*, the lawyer/draftsman of a will instructed a beneficiary to witness the will, an act that ultimately voided the beneficiary's inheritance under the instrument. The

---

12. By letter dated March 25, 1996, Transit America asked this Court "not [to] recognize any grounds for an implied contract theory in the absence of evidence necessary to prove the elements." If this was intended as a request for reconsideration of its decision of March 11, 1996, it is hereby denied for the reasons set forth in the text. Although not plead as elegantly as the Court and Transit America would like, the Second Amended Complaint articulates an implied-in-fact contract theory, and the record to date could support a judgment as to Transit America's liability on that basis.

13. The Court assumes for purposes of this discussion, but does not hold, that Pennsylvania law governs the Transit America/Berwick railcar li-

censing agreement. Transit America argues that Pennsylvania has the most significant relationship to that contract because the railcar prototype was designed, manufactured, sold and delivered to Berwick in Pennsylvania. This *argument* suggests Pennsylvania law governs, but the Court will not premise a legal conclusion upon argument; it requires sworn affidavits, certifications, or declarations that provide an evidential basis for the legal argument. In any event, given that EPIC's third party beneficiary theory survives under Pennsylvania law, the Court need not address EPIC's contention that New Jersey third party beneficiary law governs by virtue of judicial estoppel and the law of the case doctrine.

legatee sued the lawyer, alleging *inter alia* that she was a third party beneficiary of the contract between the lawyer and client/testator. Recognizing the rather procrustean effect [14] of *Spires'* requirement that an affirmative beneficiary designation appear in the contract itself, the Supreme Court adopted the test outlined in the Restatement (Second) of Contracts § 302.

(1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either

(a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or

(b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

Thus, a court must first deem third party beneficiary standing "appropriate to effectuate the intention of the parties". If appropriate, it then decides whether prong (a) or (b) applies, essentially whether the plaintiff is a creditor beneficiary (prong (a)) or a donee beneficiary (prong (b)) to whom the promisee intended to give the benefit of the promised performance. Applying the newly embraced approach, the court held that a named legatee may sue as an intended third party beneficiary of the contract through which the attorney undertook to draft a will for the testator. *See Guy,* 501 Pa. at 51, 459 A.2d 744.

Although the clarity of *Spires* and limiting language in *Guy* impelled lower courts to confine *Guy* to its facts,[15] in *Scarpitti v. Weborg,* 530 Pa. 366, 609 A.2d 147 (1992), the Supreme Court demonstrated that it intended the new approach to apply somewhat more broadly.

[W]e hold that a party becomes a third party beneficiary only where both parties to the contract express an intention to benefit the third party in the contract itself, *Spires, supra,* unless, the circumstances are so compelling that recognition of the beneficiary's right is appropriate to effectuate the intention of the parties, and the performance satisfies an obligation of the promisee to pay money to the beneficiary or the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance. *Guy, supra.*

*Scarpitti,* 530 Pa. at 372–73, 609 A.2d 147. Clarifying that the absence of an alternative remedy was not necessary to invoke third party beneficiary standing, the court concluded that plaintiffs' lawsuit should not have been dismissed on the pleadings. *See id.* at 374, 609 A.2d 147. ("Although part of what made a cause of action in *Guy* was the fact that Mrs. Guy would have been left without recourse or remedy if we denied her third party beneficiary status, the critical point in *Guy* was that the beneficiary was an intended beneficiary, intended by the promisee to receive the benefit of the promised performance.").

*Scarpitti* involved lot owners in a subdivision who contended that they were third party beneficiaries of an implied contract between an architect and the subdivision developer. A duly recorded deed restriction required purchasers of lots within the subdivision to have their home construction plans reviewed and approved by an architect retained by the developer. When the architect failed to enforce deed restrictions limiting the right of non-party owners to build

14. If *Guy* had followed the unqualified *Spires* rule, it is unlikely that any will beneficiary would ever have standing to sue the lawyer on a contract theory. As the court explained, "[t]he fact that the beneficiary is named in the will is not relevant to third party status. The will is not the contract, but rather that which is contracted for. Furthermore, even if the naming of the legatee in the will is taken as indicating the testator's intent to benefit the legatee, it cannot be taken to indicate that the drafting attorney intended to confer any benefit. It is not at all clear that an attorney ever intends to benefit a third party under a testator's will in the sense required by *Spires.*" *Guy,* 501 Pa. at 69, 459 A.2d 744.

15. In *Guy,* the court had written that "we nevertheless feel that a properly restricted cause of action for third party beneficiaries in accord with the principles of Restatement (Second) of Contracts § 302 (1979) is available to named legatees ... who would otherwise have no recourse for failed legacies which result from attorney malpractice." *Id.* at 51, 459 A.2d 744.

three-car garages, the plaintiffs sued the architect. The court held that plaintiffs were intended third-party donee beneficiaries of the architect/developer contract because "[o]bviously, the purpose of this agreement was to make lots more attractive to prospective purchasers by assuring that other homeowners in the subdivision would be required to abide by the recorded subdivision restriction." *Id.* at 373, 609 A.2d 147. The contracting parties contemplated obligations to third parties because "the homeowners ... [had] the greatest interest in uniform enforcement of restrictions and it is the homeowners who were benefitted by the establishment of a vehicle to enforce the restrictions." *Id.* Thus, the court explained, the absence of an express designation did not mitigate the fact that conferring third party beneficiary standing upon the limited class of subdivision lot owners effectuated the intention of the contracting parties. *Id.* at 373–74, 609 A.2d 147.

■ After reviewing this recent wrinkle in Pennsylvania law, and considering the procedural posture of the litigation, the Court will not foreclose the argument that EPIC was an intended donee beneficiary of the Berwick/Transit America Letter Agreement under which Transit America agreed to license to Berwick a rail car design that met AAR requirements. Transit America and Berwick contemplated obligations to third parties such as EPIC because, like the homeowners in *Scarpitti*, rail car purchasers had the greatest interest in the car being designed to meet AAR requirements. Transit America's promise was obviously intended to make the Ultra rail car "more attractive to prospective purchasers by assuring that" the car was designed for travel on all railroads. *Scarpitti*, 530 Pa. at 373, 609 A.2d 147.

Concededly, the Letter Agreement itself did not mention AAR requirements and the signatories to it, Walter Pogue and Lawrence Fort, both certify that they did not intend to obligate Transit America to EPIC or any other third party. *See* Pogue Cert. at ¶ 6; Fort Cert. at ¶ 6. However, the prior testimony of both men materially contradicts their certifications.

The following exchange occurred during Fort's testimony during the Berwick bankruptcy proceedings:

Q) Did Longo require of your company written verifications of the fact that the rail cars would meet AAR requirements?

A) That they were to the AAR specifications, yes. Well, I don't [sic] whether he wrote that specifically, but—I believe, we said that the—the—the cars would be to AAR—AAR specifications.

Fort Testimony at 54:2–7. This suggests Fort and Transit America were aware that EPIC was a potential customer who required from the designer assurances that the rail car design would satisfy AAR requirements. Even more revealing is the Pogue testimony quoted and referred to earlier in this Opinion:

Q) The next item says, "AAR certified", and has a star beside it, or some sort—

A) Yes, yes.

Q) —sort of a mark. What was discussed in the meeting on that subject?

A) Well, that would be the certification process which Mike Pavlick would have been involved in, but—Mike was responsible to get the car certified and do what he needed to do with AAR to get it certified. Arrange testing, and everything.

Q) When you say Mike was responsible to get the car certified, what's your basis for that?

A) Well, the basis for what he agreed to do; under the license agreement with Transit America, was to build a prototype, have it tested, and obtain certification for the car.

Q) At this time Berwick did not have a license agreement, did it?

A) We had a draft agreement—well, we had a letter agreement.

. . . . .

Q) Under the license agreement Transit America was obligated to build a prototype, get the car tested, get certification for the car. And I'd like you to show me the specific language in this document that creates those responsibilities.

. . . . .

A) No, I never intended to say it was exclusively on the license agreement. This is what was agreed to verbally.

Q) What was agreed to verbally?

A) That Transit America would build a prototype and have it tested.

Q) And have the prototype tested.

A) Yes; and obtain certification. That was all under an understanding, because Berwick Freight Car had no way of doing that. Transit America was the only party who could possibly do that. I mean that was a foregoing [sic] conclusion as a basis for a license agreement, and the license agreement was based on the fact that that's what would be done, but did not specifically say that. This [the licensing agreement] is primarily what provides for the royalty payment.

. . . . . .

A) [T]he understanding was that the only way this whole thing could come about was if Transit America did in fact design the car, build a prototype, have it tested in accordance with AAR requirements, *in effect be the engineering arm of Berwick freight Car Company* that does—gets the certification.

Pogue Dep. at 125:19–126:20; 127:4–11; 127:17–128:14; 133:6–13 (emphasis added). Given this testimony, the absence of any reference to the AAR in the Letter Agreement is not critical since the parties seem to have assumed obligations communicated orally but never committed to writing.[16] Moreover, Pogue's testimony suggests that manufacture of the rail car made little economic sense if the design was not intended to meet AAR standards since car purchasers would

not buy a car that railroads refused to permit on their tracks. Given this commercial reality, the record so far suggests that Berwick, the promisee, expected and obtained from Transit America, the promisor, an unwritten guarantee that the Ultra car design would indeed meet AAR full interchange standards. And the ultimate intended donee beneficiary of this promise was EPIC or any other rail car purchaser.[17] The Court therefore concludes that "the circumstances are so compelling that recognition of the beneficiary's right is appropriate to effectuate the intention of the parties...." *Scarpitti*, 530 Pa. at 373, 609 A.2d 147.

**B. Breach of Warranty**

In Count Two of the Second Amended Complaint, EPIC alleges that Transit America breached express and implied warranties regarding the design and manufacture of the Ultra rail car. The Court concludes that while the express warranty claim will be tried, under New Jersey law,[18] no implied warranty of fitness attached to the design and engineering services Transit America provided EPIC.

In an earlier decision, this Court intimated that the legal relationship between EPIC and Transit America, if one existed, was a contract to provide professional services, subject matter outside the scope of Article II of the Uniform Commercial Code. *See* December 14, 1995 Memorandum and Order (citing N.J.S.A. 12A:2–102; N.J.S.A. 12A:2–105(1) (goods are "all things ... which are movable at the time of identification to the contract")). Neither discovery nor argument by the parties[19] suggests that this early impression

---

**16.** The confidentiality agreement between Transit America and Berwick states that "[i]n providing any data hereunder, neither party makes any representation, either express or implied, as to its adequacy, sufficiency or freedom from defect of any kind, including freedom from any patent infringement that may result from the use of such data...." Def's 12(G) Statement, Ex. 23. The Pogue and Fort testimony persuades the Court that the parties may not have intended this provision to qualify Transit America's representation to Berwick that its railcar design would meet AAR full interchange requirements.

**17.** Conferring third party beneficiary status upon EPIC does not unacceptably expand the class of

contract beneficiaries because specialized railcar purchasers are part of a limited class of entities intended to benefit from Transit America's promise to Berwick.

**18.** The Court applies New Jersey law to the breach of warranty claim for the reasons outlined in the discussion of the breach of contract claim.

**19.** In fact, EPIC's characterization of the contract between it and Transit America as a contract to purchase the testing of cars, the design adequacy and fitness, and the AAR full interchange certification supports the Court's position

should be revised. Accordingly, the Court now holds that any contract between EPIC and Transit America was a services contract not subject to the implied warranties of the U.C.C. *See Board of Trustees of Union College v. Kennerly, Slomanson & Smith,* 167 N.J.Super. 311, 400 A.2d 850 (Law Div. 1979) (engineer responsible for the preparation, construction and installation of a lighting system provides services); *Snyder v. ISC Alloys, Ltd.,* 772 F.Supp. 244 (W.D.Pa.1991) (supplier of designs, technical drawings and advice relating to the conversion of metal into dust is not within the ambit of Article II); *Lincoln Pulp & Paper Co., Inc. v. Dravo Corp.,* 436 F.Supp. 262 (D.Me.1977) (engineering contract is not governed by Article II); *United States v. Antenna Systems, Inc.,* 251 F.Supp. 1013, 1015 (D.N.H.1966) ("[B]lue prints, drawings etc., in reality the visual reproductions on paper of engineering concepts, ideas and principles, are general intangibles ... not 'goods' [under] the Code."). *Cf. Conopco v. McCreadie,* 826 F.Supp. 855 (D.N.J.1993) (assessing whether complex contract was primarily for services or goods, court treats computer system design and engineering support as services not governed by Article II), *aff'd,* 40 F.3d 1239 (3d Cir. 1994).

Nor does New Jersey common law imply a warranty of fitness in a professional services contract between an engineer and the entity to whom it provides skill and expertise. *See Board of Trustees of Union College v. Kennerly, Slomanson & Smith,* 167 N.J.Super. 311, 400 A.2d 850 (Law Div. 1979). Canvassing New Jersey law, which in the past few decades had witnessed an expansion of liability in the product defect context, the court in *Union College* observed that strict liability had not been extended to the professional services context. *See Magrine v. Krasnica,* 94 N.J.Super. 228, 227 A.2d 539 (Law Div.1967), *aff'd sub nom., Magrine v. Spector,* 100 N.J.Super. 223, 241 A.2d 637 (App.Div.1968), *aff'd,* 53 N.J. 259, 250 A.2d 129 (1969); *La Rossa v. Scientific Design Co.,* 402 F.2d 937 (3d Cir.1968) (applying New Jersey law, court held strict liability inapplicable to services rendered by engi-

neering company). Given New Jersey's approach to strict liability, the court followed the majority approach and held that New Jersey law would not imply a warranty of fitness in a professional services relationship. *See, e.g., Klein v. Catalano,* 386 Mass. 701, 437 N.E.2d 514 (1982) (favorably citing *Union College* for proposition that no implied warranty in professional services relationship); *Sears, Roebuck & Co. v. Enco Assoc., Inc.,* 43 N.Y.2d 389, 401 N.Y.S.2d 767, 372 N.E.2d 555 (1977); *City of Mounds View v. Walijarvi,* 263 N.W.2d 420 (Minn.1978); *Audlane Lumber & Builders Supply, Inc. v. D.E. Britt Associates, Inc.,* 168 So.2d 333 (Fla.D.Ct.App.1964), *cert. denied,* 173 So.2d 146 (Fl.1965); *State of New Mexico v. Gathman–Matotan Architects and Planners, Inc.,* 98 N.M. 790, 653 P.2d 166 (N.M.App.), *cert. quashed,* 99 N.M. 47, 653 P.2d 878 (1982); *Johnson–Voiland–Archuleta, Inc. v. Roark Assoc.,* 40 Colo.App. 269, 572 P.2d 1220 (1977); *Allied Properties v. John A. Blume & Assoc., Engineers,* 25 Cal.App.3d 848, 102 Cal.Rptr. 259 (1972). *But see Broyles v. Brown Engineering Co.,* 275 Ala. 35, 151 So.2d 767 (1963). Professionals such as engineers, doctors, architects or lawyers exercise individualized judgment "in a situation where unknown and uncontrollable factors are common," *id.* at 317, 400 A.2d 850, thus freeing them of the obligation to guarantee satisfaction. Professionals must of course exercise reasonable skill and judgment, but they do not impliedly warrant that their service will be fit for the use intended.

Finding *Union College* persuasive and directly applicable, the Court will grant Transit America partial summary judgment dismissing EPIC's implied warranty claim. But summary judgment as to the express warranty claim in Count II is denied because there is a dispute as to whether Transit America represented that the Ultra car would satisfy AAR standards.

### C. Consumer Fraud Act

Count Four of the Second Amended Complaint asserts a cause of action against Transit America under the New Jersey Con-

---

that any contract between the two was a services contract.

sumer Fraud Act (the "Act"). *See* N.J.S.A. 56:8–1 *et seq.*[20] This claim is legally untenable since EPIC is not a "consumer" and the Ultra car design is not "merchandise".

New Jersey courts have admonished that the judiciary must "place reasonable limits upon the operation of the Act 'despite broad statutory language, so that its enforcement properly reflects legislative intent, however ascertained.' " *DiBernardo v. Mosley,* 206 N.J.Super. 371, 375, 502 A.2d 1166 (App. Div.) (quoting *Jones v. Sportelli,* 166 N.J.Super. 383, 388, 399 A.2d 1047 (Law Div.1979)), *certif. denied,* 103 N.J. 503, 511 A.2d 673 (1986). A critical limitation is that the Act does not regulate sales that cannot be considered sales to consumers as that term is commonly understood. "[I]t is our considered opinion that the entire thrust of the Consumer Fraud Act is pointed to products and services *sold to consumers in the popular sense.*" *Neveroski v. Blair,* 141 N.J.Super. 365, 378, 358 A.2d 473 (App.Div.1976) (emphasis added), *abrogation recognized by Arroyo v. Arnold–Baker & Associates, Inc.,* 206 N.J.Super. 294, 502 A.2d 106 (Law.Div.1985) (abrogation due to an amendment to the Act). Other cases suggest that this "popular sense" of consumer transactions encompasses mass produced items available to multiple customers. *See DiBernardo,* 206 N.J.Super. at 376, 502 A.2d 1166 (no claim under the Act based on fraudulent concealment of a defective septic system within home sold to plaintiff); *Perth Amboy Iron Works, Inc. v. American Home Assurance Co.,* 226 N.J.Super. 200, 543 A.2d 1020 (App.Div.1988), *aff'd,* 118 N.J. 249, 571 A.2d 294 (1990) (Act comprehended claim against yacht manufacturer that allegedly concealed problems with a

mass-produced engine). This more limited interpretation accords with legislative intent, which was to curb "sharp practices and dealings in the marketing of merchandise and real estate whereby the consumer could be victimized by being lured into a purchase through fraudulent, deceptive or other similar kind of selling or advertising practices." *Daaleman v. Elizabethtown Gas Company,* 77 N.J. 267, 271, 390 A.2d 566 (1978).

Three cases warrant more extended discussion. In *Neveroski,* the Appellate Division held that real estate brokerage services were not consumer merchandise within the ambit of the Act. In *dicta* of particular significance to the instant case, the court opined that:

> no one would argue that a member of any of the learned professions is subject to the provisions of the Consumer Fraud Act despite the fact that he renders "services" to the public. And although the literal language may be construed to include professional services, it would be ludicrous to construe the legislation with that broad a sweep in view of the fact that the nature of the services does not fall into the category of consumerism.

*Neveroski,* 141 N.J.Super. at 379, 358 A.2d 473. The court supported this conclusion by recourse to the canon of construction, *ejusdem generis,*[21] and held that real estate was foreign to any examples listed in the statutory definition of merchandise. This *dicta* suggests that engineering and other professional services do not constitute merchandise as defined in the Consumer Fraud Act.

The most factually analogous New Jersey decision is *BOC Group, Inc. v. Lummus*

---

20. N.J.S.A. 56:8–2 states:

The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice. . . .

In the definitions section of the Act, N.J.S.A. 56:8–1, "merchandise" is defined to "include any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale." A "person" includes "any natural person or his legal representative, partnership, corporation, company, trust, business entity or association, and any agent, employee, salesman, partner, officer, director, member, stockholder, associate, trustee or cestuis que trustent thereof."

21. This canon prescribes that general words are to be construed as of the same general kind or class as those items specifically enumerated.

*Crest, Inc.*, 251 N.J.Super. 271, 597 A.2d 1109 (Law Div.1990), in which the trial court held that a contract selling a design for a petroleum refining process was not merchandise under N.J.S.A. 56:8–1(c). As part of its alternative holding, the court explained that "[e]ven if the court were to conclude that this new experimental process was a service sold to plaintiff, the process was certainly not the type of service contemplated by the Act, nor was it sold or capable of being sold 'to the public'", *see id.*, as that term is popularly understood (quoting *Neveroski*, 141 N.J.Super. at 378, 358 A.2d 473). Indeed, the suit involved complex, state-of-the-art technology in a very limited field and was between large corporations that had negotiated over some two years. This did not bear any reasonable similarity, the court wrote, to the services enumerated and defined in the regulations promulgated under authority of the Act. *See* N.J.A.C. 13:45A–1 *et seq.*[22] It then concluded that "the design in question [did] not fall within the definition of 'merchandise' within the parameters of the Consumer Fraud Act and that the plaintiff [was] not a 'consumer' within the purpose and intent of the Act." *BOC Group*, 251 N.J.Super. at 281, 597 A.2d 1109.

Most recently, the Court of Appeals examined the scope of the Consumer Fraud Act and relied on, *inter alia*, *BOC Group* and *Neveroski* to support its holding that a franchise did not fall within the Act's conception of "merchandise". *See J & R Ice Cream Corp. v. California Smoothie Licensing Corp.*, 31 F.3d 1259 (3d Cir.1994).

> Like the Supreme Court in *Daaleman* and [*Kugler v.* ] *Romain*, [58 N.J. 522, 279 A.2d 640 (1971) ], and the Appellate Division in *Neveroski*, we conclude that the term "merchandise" must be construed in light of the overriding purpose of the Act, which was "to protect the *consumer* in the context of the ordinary meaning of that term in the market place." *Neveroski*, 358 A.2d at 480. The ordinary meaning of the consumer in the marketplace does not include the purchaser of a franchise. Moreover,

like "real estate," "franchises" are not included expressly in the Act's definition of "merchandise" and are "wholly foreign to any of the listed examples specifically referred to in the definition." *Id.*
*J & R Ice Cream Corp.*, 31 F.3d at 1273. The court held that a person purchasing a franchise is not in a "consumer oriented situation", taking the transaction outside the Act's scope. *Id.* But it went further, deciding that even when a franchise is available to the public at large, it is not covered by the Consumer Fraud Act because businesses are purchased for their cash flow, not for consumption, and because businesses do not resemble the commodities and services listed in the statute or affiliated regulations. *Id.* at 1274.

As in these cases, Transit America did not offer to license its rail car design to the public at large but rather to a narrow class of manufacturers, and always maintained ownership of the design. *See* Defendant's 12(G) Statement, Ex. 23. Moreover, the alleged promise that the Ultra prototype would meet AAR requirements, and that Transit America would guide the car through the AAR certification process, were not promises to provide services to the general consuming public.

It is thus abundantly clear that the Consumer Fraud Act has no application to EPIC's case against Transit America. Even if EPIC was affirmatively misled by Transit America's efforts to market the rail car, the product sold does not constitute "merchandise" under the statute, and the tripartite relationship between Transit America, Berwick and EPIC was not a "consumer oriented situation". *J & R Ice Cream Corp.*, 31 F.3d at 1273. The Court will grant partial summary judgment dismissing the consumer fraud claim.

## II. Damages Issues

### A. Judicial Estoppel

▮▮▮ As mentioned above, EPIC tendered a claim for $9,263,226.79 during the Berwick bankruptcy proceedings, an amount equal to

---

**22.** The regulations, which expired on November 9, 1995 pending enactment of new (and substantively similar) proposed regulations, speak to widely available services such as the repair of home appliances and health club memberships. *See* N.J.A.C. 13:45A–10.1 *et seq.*; N.J.A.C. 13:45A–25.1 *et seq.*

the sum of eight of the nine damages claims EPIC submitted in this action. Transit America argues that EPIC is judicially estopped from asserting that Transit America is responsible for these damages, because it contended before the bankruptcy court that Berwick was responsible.

As explained in *O'Neida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 419 (3d Cir.), *cert. denied*, 488 U.S. 967, 109 S.Ct. 495, 102 L.Ed.2d 532 (1988), judicial estoppel "applies to preclude a party from assuming a position in a legal proceeding inconsistent with one previously asserted. Judicial estoppel looks to the connection between the litigant and the judicial system while equitable estoppel focuses on the relationship between the parties to the prior litigation." The doctrine prevents a party from assuming contradictory factual positions, *but cf. Murray v. Silberstein*, 882 F.2d 61 (3d Cir.1989) (plaintiff barred from asserting claim for money damages under § 1983 when he had earlier obtained preliminary injunctive relief based on argument that 11th Amendment precluded recovery of money damages), and tends to apply when a party's prior inconsistent position was successfully maintained. *See Bower v. O'Hara*, 759 F.2d 1117, 1127 (3d Cir.1985). Transit America does not here assume a position inconsistent with its position before the bankruptcy court since joint and several liability allows EPIC to assert that both Transit America and Berwick are responsible for its damages. Since these defendants are named in different actions, the Court must merely ensure that no double recovery is awarded.

**B. Release**

Assuming *arguendo* that EPIC can establish liability, Transit America argues that the August, 1991 and June 5, 1992 settlements between Berwick and EPIC settled and released all the claims sued upon here. The June 5, 1992 release reads as follows:

> EPIC, on the one hand, and CWPHIC, Maxon and Berwick, on the other hand, hereby release and forgive any and all claims, demands and causes of action against the other arising out of the Agreement, including but not limited to EPIC's claim of $648,908 for late delivery charges and Berwick's claim of $1,600,000 for cancellation charges, except for (i) future warranty obligations of Berwick under the Agreement and (ii) the provisions of this Agreement. *Nothing in this Agreement will relieve Berwick of its design and manufacture warranty for the cars. The cars will handle and will be tested utilizing 6 loaded containers.* (emphasis added).

*See* Def's 12(G) Statement, Ex. 13. To the extent that Transit America and Berwick were joint obligors to EPIC, or that EPIC was a third party beneficiary, Transit America suggests the claims released against Berwick were released against it as well. The Court disagrees because the effect of a release is a question of intent and Transit America has produced no evidence that EPIC intended to release claims that had accrued against Transit America. Moreover, according to the release, EPIC explicitly retained at least some of the claims asserted in this litigation. For these reasons, the June 5, 1992 release does not entitle Transit America to partial summary judgment.

**C. Satisfaction**

Transit America argues that EPIC already received full and adequate compensation for five damages claims tendered in this litigation, and that further recovery would place the plaintiff in a better position than if the contract had been performed. *See A–S Development Inc. v. W.R. Grace Land Corp.*, 537 F.Supp. 549, 557 (D.N.J.1982), *aff'd*, 707 F.2d 1398 (3d Cir.1983). The Court will deny partial summary judgment on this ground as well because a dispute exists as to whether EPIC has been fully compensated for the five claims.

*1. Change from Draft Gears to End-of-Car Cushioning (EOCC)*

In 1991, EPIC and Berwick became embroiled in a dispute concerning the cushioning device with which the Ultra cars had been equipped. In a conflict that threatened to hold car production hostage to litigation, EPIC asserted that the rail cars should have originally been manufactured with EOCC, while Berwick contended that the rail cars

were appropriately offered for sale with draft gears. *See* Def's 12(G) Statement, Exs. 11–12. EPIC settled the dispute by agreeing to pay $2,000 more per car for equipment that Berwick estimated cost $4,253 for each of the 35 rail cars already equipped with draft gears, and $6,762 for each of the 115 rail cars not yet manufactured. Accordingly, Transit America maintains, EPIC paid just $300,000 ($2,000 × 150 cars) for EOCC-equipped rail cars worth $926,485 (($4,253 × 35 cars) + ($6,762 × 115 cars)), a net *gain* of $626,485.

Although clever, this argument ignores that EPIC firmly believed it was entitled to EOCC-equipped cars at no additional cost, and agreed to pay the extra $300,000 "solely to facilitate continued performance by Berwick". *Id.*, Ex. 10 at ¶ 5. If the original January 17, 1991 contract indeed entitled EPIC to EOCC, a question that awaits trial, only mathematical sleight of hand would now permit the conclusion that a settlement requiring it to spend *more* money constituted a financial gain.

### 2. Damages Enumerated in Claims 2–5

Transit America enumerates four other damages claims for which EPIC allegedly received full compensation from Berwick via the June 5, 1992 release. *See* Def's 12(G) Statement, Ex. 13. According to Transit America, the "any and all claims ... including but not limited to" language in the release must be construed to include claims for: 1) $389,952 in extra transportation costs incurred due to the changeover from draft gears to end of car cushions; 2) $426,250 for the cost of center sill reinforcements and inspections precipitated by the alleged failure of one of the cars on November 5, 1991; 3) $267,241 for the rental and other additional costs associated with gondola cars used after Conrail and Southern Pacific refused to pull the Ultra car due to the defective center sill; and 4) $228,825 in additional costs incurred because the defective center sill design reduced the maximum Ultra car payload to four, rather than six, containers. *See* Def's

12(G) Statement, Exs. 14 and 35 (claims 2–5). It further reasons that, in the aggregate, all the claims EPIC asserted against Berwick as of June 5, 1992 equaled $1,761,166,[23] which EPIC exchanged for Berwick's surrender of claims worth $2,215,090,[24] an exchange *gain* of approximately $450,000. Transit America thus concludes that EPIC already received as much or more than necessary to compensate it for the alleged damages.

The Court again rejects Transit America's premise. Merely because EPIC exercised its informed business judgment and settled an ongoing dispute with Berwick does not mean that its losses were compensated. As Transit America no doubt understands, settlements reconcile the conflicting positions of the parties and emerge after a reasoned analysis of legal and business risks. Often a matter of expedience, settlements inevitably fail to provide parties the complete remediation to which they feel entitled. With this in mind, the Court finds nothing in the record that conclusively establishes whether EPIC received full compensation for the damages outlined in claims two through four. While the Berwick settlement may have provided some compensation, the jury must determine the extent to which EPIC agreed in June 1992 to accept less than full compensation to facilitate Berwick's continued performance. Because Transit America's alleged negligence or breach of contract/warranty may have caused the losses left uncompensated by the June 5, 1992 settlement, partial summary judgment will be denied.

### Conclusion

For the foregoing reasons, the Court denies partial summary judgment as to Count One and the express warranty claim in Count Two, and grants it as to Count Four and the implied warranty claim in Count Two of the Second Amended Complaint.

---

**23.** This figure equals $300,000 (claim 1) + 389,952 (claim 2) + 430,148 (claim 3) + 267,241 (claim 4) + 228,825 (claim 5) + 145,000 (cost of AAR testing).

**24.** Transit America derives this figure by adding together Berwick's $1,600,000 claim for cancel-

lation charges, explicitly released in the settlement agreement, and $615,090 (41,006 × 15), the total savings EPIC accrued because Berwick agreed to accept $20,000, rather than $61,006, per car for the 15 Ultra cars delivered to EPIC in November 1991.